[Cite as *State v. Reindel*, 2017-Ohio-28.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | C.A. CASE NO. 26998 |
| | : | |
| v. | : | T.C. NO. 15CRB2281 |
| | : | |
| DANIEL S. REINDEL | : | (Criminal appeal from |
| | : | Municipal Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

**O P I N I O N**

Rendered on the ___6th___ day of _____January_____, 2017.

. . . . . . . . . . .

NOLAN C. THOMAS, Atty. Reg. No. 0078255, Prosecuting Attorney, City of Kettering, 2325 Wilmington Pike, Kettering, Ohio 45420
     Attorney for Plaintiff-Appellee

KIRSTEN KNIGHT, Atty. Reg. No. 0080433, P. O. Box 137, Germantown, Ohio 45327
     Attorney for Defendant-Appellant

. . . . . . . . . . . .

DONOVAN, P.J.

{¶ 1} This matter is before the Court on the Notice of Appeal of Daniel S. Reindel, filed January 25, 2016. Reindel appeals from his judgment entry of conviction, following a no contest plea, to one count of voyeurism, in violation of R.C. 2907.08(A), a misdemeanor of the third degree. We hereby affirm the judgment of the trial court.

{¶ 2} Reindel was charged by way of complaint on November 19, 2015, with a violation of R.C. 2907.08(A), was well as a violation of R.C. 2911.211, which proscribes aggravated trespassing. He entered a plea of not guilty on November 20, 2015, and he subsequently filed a motion to suppress.

{¶ 3} At the suppression hearing, Officer Jason Kramer of the Kettering Police Department testified that on November 17, 2015, while in uniform and in his cruiser, he was dispatched to the area of 4313 Sunray Drive at about 5:17 p.m. "to check for a male that was observed by a neighbor looking into the windows of the house" on Sunray. Kramer stated it "was reported that * * * the male that had been looking in the windows was fleeing the area on foot, and being followed by a neighbor." Kramer stated that while "we were responding, the dispatcher updated with information the subject was supposed to be white, approximately forty (40) years old and wearing a black leather jacket."

{¶ 4} Kramer stated that he continued to receive information that the suspect "was being followed all the way up to approximately the area of Shroyer and Lamont where the subject was watched crossing Shroyer and going into Town and County." Kramer testified that as he approached the area, he observed a person waving at him and pointing to the Town and Country entrance by Figlios. Kramer stated he parked by the entrance as Lieutenant Gabrielson arrived at the location, and that they went inside together. Kramer stated that he "began checking the restrooms that were just inside that entrance. We looked into Figlios, and we started up toward the front of Town and County. Lieutenant Gabrielson continued down the hallway toward the center of Town and Country, and I went out the front doors by Orange Leaf."

{¶ 5} Kramer stated that he looked out to the end of the parking lot and observed

"a white subject wearing a dark colored coat that appeared to be a very similar description. He was stepping from the parking lot and out onto the large sidewalk that's along Stroop Road, and he was walking west." Kramer stated that he ran toward the suspect and "was able to realize it was, in fact, a white male. He was wearing what appeared to be a black leather coat, and he would have been approximately the age of 40s that was described by the dispatcher." Kramer stated that he "hollered to the subject to stop. He did not stop the first time I hollered, and then I hollered, stop, police, or something to the effect with police in it." Kramer stated that the suspect, who turned out to be Reindel, immediately stopped and turned toward him. Kramer stated that Reindel "placed his left hand directly into his front pocket," and that Kramer "drew my pistol." He stated that he "pointed it at him, and I ordered him to slowly remove it from his pocket." Kramer stated that he "had already been on the radio while I was jogging out to that location, so Lieutenant Gabrielson was aware of where I was heading." Kramer stated that he "held the subject at gun point until Lieutenant Gabrielson got close, at which time I ordered him to turn around and he was secured in handcuffs." At that point, Kramer stated that he holstered his weapon. When asked why he had drawn his weapon, Kramer said that Reindel "didn't initially respond to my command to stop, and then as soon as he did stop, he jammed his hand directly in his pocket. I had no knowledge of whether he had a weapon or what had transpired." Kramer stated that he was concerned for his safety at the time.

{¶ 6} Kramer stated that "[w]e needed to conduct an investigation about what happened to find out whether there was, in fact, any type of violation that occurred, and I told the gentleman directly when I handcuffed him that he was not in custody, that he was

being detained while we conduct an investigation for the security of him and the safety of officers." When asked specifically what he said to Reindel at the time, Kramer responded, "When I placed him in handcuffs, I don't remember the exact words. I would typically say something to the effect of I'm placing you in handcuffs, but you are not under arrest at this time. The detention is for us to conduct an investigation."

{¶ 7} Kramer stated that he asked Reindel "if he had anything harmful on him," and that he did not recall his answer. He stated that he "asked him if I could search through all of his pockets, and he said that I could, and I did conduct a search of him." Kramer stated that he found a "small knife that was unconsequential" (sic) in the course of the search. Kramer stated that Reindel was carrying a backpack which he placed on the ground when he was stopped, and that Sergeant Green searched the backpack with Kramer's permission. At the time, Kramer stated that Reindel was standing in the middle of the sidewalk in a public area facing him. Regarding the amount of daylight, Kramer stated that "it was original daylight, and then as we stood the sun went down, so it was a combination of both throughout the time that we were there." According to Kramer, Stroop Road was just a few feet away and there was traffic on the road.

{¶ 8} Kramer stated that "Lieutenant Gabrielson had asked Sergeant Gaudetter to find the * * * witness that had been following Mr. Reindel so that we could identify whether or not he was actually the person involved, and we could conduct an investigation on what happened on Sunray." Kramer testified that he "didn't have anything to do other than make conversation with Mr. Reindel waiting to find out what, if anything, had happened, or what the situation was." Kramer stated he "asked Mr. Reindel what he was out doing tonight." Kramer testified that Reindel "actually began talking for several

minutes. Mr. Reindel at that point made several comments to me. I didn't engage him with any questions at that point, I just let him talk." Kramer stated that Reindel talked for "between forty-five seconds and a minute." Kramer stated that after Reindel "finished talking, I asked him a coupled specific questions about where he lived, and how he got back and forth to work. He answered those questions." Kramer testified, "Sometime shortly after that, Sergeant Gaudette arrived in the area with Mr. Roll, and Mr. Roll advised that Mr. Reindel, the gentleman we had identified as Mr. Reindel was the same subject that he had seen looking into the windows at 4313 Sunray, and the same subject that he had followed all the way over to Town and Country."

{¶ 9} Kramer stated that Reindel "was told that he was going to be placed in the car awaiting confirmation that the house was occupied, and Lieutenant Gabrielson meeting [sic] with the people that were, the actual victims that would have been in that house because the witness that followed, it was not his house, he had just observed this happen." Kramer stated that Reindel was placed in the back of his cruiser while Gabrielson "drove to Sunray. He confirmed that the house was occupied by three (3) people at the time, and following confirmation, I advised Mr. Reindel that he was under arrest for voyeurism." During this time, Kramer testified that Reindel motioned for him to come to the cruiser and told him that his handcuffs were too tight. Kramer stated that he loosened the handcuffs.

{¶ 10} Kramer stated that he then transported Reindel to the Kettering jail. He stated that while stopped at the corner of Stroop and Shroyer Roads, he "read Mr. Reindel his rights verbatim from the card that the City of Kettering Police Department's issued to me." Kramer stated that he "asked him if he understood his rights, and he said he did.

And there's a phrase on there that asks whether he wants to ask, answer questions without an attorney, and he said that he would answer questions without an attorney with him." Kramer identified a copy of the card he used to advise Reindel of his rights. Kramer stated that Reindel continued to make a statement in the cruiser regarding the events of November 17, 2015. Kramer stated that Reindel provided a written statement in an interview room at the jail, and he identified a copy of the statement. Kramer stated that Reindel "never asked for an attorney at any point," and that he never indicated any unwillingness to speak to Kramer. In response to a question from the court, Kramer stated that approximately 10 minutes elapsed from his initial contact with Reindel on the sidewalk until he advised him that he was under arrest.

{¶ 11} On cross-examination, Kramer stated that in the course of the encounter, Reindel "was not free to leave. We were conducting an investigation." Kramer stated that during his conversation with Reindel he told him that it was good that he was being honest about his actions so that he could obtain help. Kramer stated that "[t]oward the end of the conversation after he had made numerous statements, I clarified where he lived and I asked him how he got back and forth to work." Kramer stated that "after I read him Miranda, I had asked him some very specific questions. Back at the jail he did confirm some of * * * the things that he had originally stated to me, but at the time when we were still in the car, the interaction was me asking him questions and him answering them." Kramer stated that Reindel advised him that he has a sexual addiction problem prior to being advised of his rights.

{¶ 12} After Kramer stepped down, the court held as follows:

> The essence of the Motion to Suppress that the Defendant has filed

is that the Defendant is what we call, have come to call his Miranda Rights that were not given to him at an appropriate time and, therefore, any statements he would have made in response to any questions by the officer should be excluded from evidence. I think we've all been around and watched enough television to know what we mean when we say Miranda Rights, and those were reflected in the State's Exhibit A, the card that the police used and that the officer testified that a point later in the evening read to the Defendant. The question is the initial contact of the officer with the Defendant in that, the testimony that I heard was that there was a report of a crime and a description of the suspect who had committed that crime. It was a white male, fortyish, general description leather coat and someone following them, and this would be considered a clue, a rather good clue. The officer then reports that the citizen directs him into the front area of Town and Country Shopping Center, and the Defendant, from my understanding, the officer's testimony matches the description of the person reported to have committed the crime. The officer's testimony, in considering the totality of the circumstances here, the Defendant does not respond his first order to stop. May or may not be critical, could have been traffic noise, could have been anything else. But if you're a policeman you don't have to assume the best, you may, he is entitled to assume the worst that he didn't stop for bad reasons. So when he calls him to stop again and he does stop, he puts his hand in his pocket. He now doesn't really know what's going on so the officer draws his weapon. Now that is a, he's totally

justified in doing that, and the testimony as I understand it is that the weapon didn't stay on the Defendant. He wasn't held at gunpoint for any significant length of time, only until the officer could control the Defendant, and make sure he did not have a weapon. And if I understand the, if I recall the testimony, it is at this point that he is then handcuffed. The Defendant appears to be a normal appearing person, and the officer, the testimony of the officer is that the Defendant seemed to understand him and would respond appropriately as they talked during the course of the evening. Defendant had no deficit of the ability to understanding [sic] what's going on. His age and his mental condition would be that he is a normal, reasonably normal person and understood what was taking place. The officer said that he asked the Defendant after he had detained him, what are you doing out tonight, or words to that effect upon which it's my understanding the Defendant basically confessed and talked uninterrupted for some time admitting pretty much each and every element is my understanding of the offense as we went along. He was not under arrest at that time by the officer's testimony. He was obviously being detained. He was not free to leave. When Mr. Nolan gets pulled over for speeding, he's not free to leave, he has to stay there until the policeman writes him his speeding ticket. If he tries to leave, the policeman can use some steps to stop him from leaving. But he's certainly not under arrest. At the time that Officer Kramer was talking to the Defendant, he was also not free to leave, but he wasn't under arrest, and the obligation of the officer to give

Miranda Warnings, that is not triggered by my evaluation of the facts of this case until the Defendant is actually placed under arrest. And any statements made by the Defendant beforehand were basically voluntary and he did not have a constitutional right violated by the officer's innocuous, what are you doing out tonight question during a, what the officer is testified is a ten (10) minute period, and that I believe is also significant. He wasn't there for an hour. He wasn't there for forty-five (45) minutes. From the time he stops him, until he tells him he's under arrest according the officer [sic] is approximately ten (10) minutes. And I believe that the officer, based on his testimony had probable cause to arrest him without the Defendant's statement. So the subsequent, the arrest, and the subsequent statement obtained after he had given him his Miranda Warnings is also not subject to exclusion. So, your Motion's denied.

{¶ 13} On December 21, 2015, "Defendant's Acceptance of Plea Offer and Plea" was filed which provides that in exchange for his no contest plea to the voyeurism charge, the aggravated trespassing charge would be dismissed. Reindel entered his no contest plea the same day. On January 12, 2016, the court sentenced Reindel to 60 days in the Montgomery County Jail, with 25 days suspended, and placed him on supervised probation for a period of five years. The court ordered him to complete assessments and counseling as ordered by the probation department. Reindel's sentence was stayed pending appeal.

{¶ 14} Reindel asserts one assignment of error herein as follows:

THE TRIAL COURT ERRED WHEN IT HELD THAT APPELLANT'S

STATEMENT TO POLICE PRE-MIRANDA WAS VOLUNTARY.

**{¶ 15}** Reindel asserts as follows:

In this case Appellant was handcuffed and standing on the sidewalk when Officer Kramer asked him, "what are you doing out tonight?" * * * Appellant answered the question and continued to talk for approximately 45 seconds to a minute. The officer did not interrupt him. * * * Although the record is unclear what Appellant said, the trial court noted in its decision that Appellant essentially admitted to each element of the offense while he was talking to the officer. * * * Appellant was arrested for Voyeurism. At the time Appellant made the statement in question he had not been mirandized. He was handcuffed on a sidewalk with a number of police officers standing nearby. He was told that he was being detained but was not under arrest. Prior to asking Appellant what he was doing out tonight the police should have advised Appellant of his Miranda rights. He was obviously not free to leave at that point and he was asked a question specifically designed to elicit an incriminating answer. Because Appellant was being detained and was being asked questions by police without having been advised of his Miranda rights, the trial court erred when it overruled Appellant's motion to suppress.

**{¶ 16}** The State responds that "*Miranda* warnings are required only for custodial interrogations, and as Officer Kramer's encounter with Appellant was neither custodial nor an interrogation, Appellant's assignment of error is without merit."

**{¶ 17}** "In *Miranda v. Arizona* (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d

694, the United States Supreme Court held that the State may not use statements stemming from a defendant's custodial interrogation unless it demonstrates the use of procedural safeguards to secure the defendant's privilege against self-incrimination. *Id.* at 444*." State v. Hardy*, 2d Dist. Montgomery No. 24114, 2011-Ohio-241, ¶ 31. As this Court noted in *State v. Hatten*, 186 Ohio App.3d 286, 2010-Ohio-499, 927 N.E.2d 632, ¶ 48-50:

> "[I]n reviewing decisions on motions to suppress, an appellate court reviews the record to see if substantial evidence exists to support the trial court's ruling, bearing in mind that the trial court has the function of assessing credibility and weighing evidence. See, e.g., *State v. Brown* (1993), 91 Ohio App.3d 427, 429–430, 632 N.E.2d 970, * * *. However, in the particular area of custodial interrogations, the United States Supreme Court has said that whether a suspect is in custody is a mixed question of fact and law entitled to independent review. *State v. Smith* (June 3, 1997), Franklin App. No. 96AP10–1281, * * *, citing *Thompson v. Keohane* (1995), 516 U.S. 99, 116 S.Ct. 457, 460, 133 L.Ed.2d 383. See also, *State v. Evins* (Feb. 28, 1997), Montgomery App. No. 15827, [1997 WL 82803]." *State v. Estepp* (Nov. 26, 1997), Montgomery App. No. 16279, 1997 WL 736501, *2.

> Police are not required to give warnings pursuant to *Miranda v. Arizona* (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, to every person they question, even if the person being questioned is a suspect. *State v. Biros* (1997), 78 Ohio St.3d 426, 440, 678 N.E.2d 891. Instead,

Miranda warnings are required only for custodial interrogations. Id. "The determination of whether a custodial interrogation has occurred requires an inquiry into 'how a reasonable man in the suspect's position would have understood his situation.' [*Berkemer v. McCarty* (1984), 468 U.S. 420, 442, 104 S.Ct. 3138, 82 L.Ed.2d 317.] ' "[T]he ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with formal arrest." ' " *Estepp*, 1997 WL 736501, *4, quoting *Biros*, 78 Ohio St.3d at 440, 678 N.E.2d 891, in turn quoting *California v. Beheler* (1983), 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275.

In reaching this determination, neither the subjective intent of the officer, nor the subjective belief of the defendant is relevant. *Estepp*, 1997 WL 736501, *4, citing *State v. Hopfer* (1996), 112 Ohio App.3d 521, 546, 679 N.E.2d 321, discretionary appeal not allowed, 77 Ohio St.3d 1488, 673 N.E.2d 146. Instead, we have considered factors such as the location of the interview and the defendant's reason for being there, whether the defendant was a suspect, whether the defendant was handcuffed or told he was under arrest or whether his freedom to leave was restricted in any other way, whether there were threats or intimidation, whether the police verbally dominated the interrogation or tricked or coerced the confession, and the presence of neutral parties. *Estepp* at *4.

{¶ 18} As this Court has further previously noted:

" 'Interrogation' includes express questioning as well as 'any words or actions on the part of the police (other than those normally attendant to

arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.' " [*State v.Strozier*, 172 Ohio App.3d 780, 2007-Ohio-4575, 876 N.E.2d 1304], at ¶ 20, quoting *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). "Interrogation" must reflect "a measure of compulsion above and beyond that inherent in custody itself." Innis, 446 U.S. at 300. "Police officers are not responsible for unforeseeable incriminating responses." *State v. Waggoner*, 2d Dist. Montgomery No. 21245, 2006–Ohio–844, ¶ 14; *Strozier* at ¶ 20.

*State v. Hogle*, 2d Dist. Greene No. 2014-CA-41, 2015-Ohio-2783, ¶ 23.

{¶ 19} It is clear from the record before us that multiple officers, namely Kramer, Gabrielson, Green, and Gaudetter were involved in the investigation herein. Although Reindel was told that he was not in custody or under arrest, he was stopped at gunpoint, handcuffed, searched (with his consent), and placed in the back of Kramer's cruiser. Even if we were conclude, however, that Reindel was deprived of his freedom in a significant way and was accordingly in custody, we cannot conclude that Kramer's questions about what Reindel was doing on the night of the incident, or how he got back and forth to work, rose to the level of interrogation. We have no basis to conclude that Kramer should have known that his innocuous questions were reasonably likely to elicit an incriminating response from Reindel. Further, there is no evidence that Kramer employed threats or intimidation or tricked Reindel into making statements prior to advising him of his rights. In other words, there is no measure of compulsion in the record before Reindel was advised of his rights. Kramer testified that Reindel "actually began talking for several

minutes. Mr. Reindel made several comments to me. I didn't engage him with any questions at that point, I just let him talk." The trial court clearly found Kramer's testimony to be credible, and we defer to the court's assessment of credibility. For the foregoing reasons, we conclude that Reindel's sole assignment of error lacks merit, and it is accordingly overruled. The judgment of the trial court is affirmed.

. . . . . . . . . .

HALL, J. and WELBAUM, J., concur.

Copies mailed to:

Nolan C. Thomas
Kirsten Knight
Hon. James F. Long