[Cite as *State v. Verdell*, 2018-Ohio-4766.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 27786 |
| | : | |
| v. | : | Trial Court Case No. 2016-CR-3964 |
| | : | |
| JOSHUA VERDELL | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 30th day of November, 2018.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by HEATHER N. JANS, Atty. Reg. No. 0084470, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, Dayton, Ohio 45422
      Attorney for Plaintiff-Appellee

AMY E. FERGUSON, Atty. Reg. No. 0088397, 130 West Second Street, Suite 1818, Dayton, Ohio 45402
      Attorney for Defendant-Appellant

. . . . . . . . . . . . .

WELBAUM, P.J.

{¶ 1} Defendant-appellant, Joshua Verdell, appeals from his conviction in the Montgomery County Court of Common Pleas after he pled no contest to murder, felony murder, felonious assault, tampering with evidence, and several firearm specifications. In support of his appeal, Verdell contends the trial court erred in failing to suppress incriminating statements that were not preceded by *Miranda* warnings. Verdell also contends that the trial court erred in failing to suppress incriminating statements that were made after an alleged involuntary waiver of his *Miranda* rights. For the reasons outlined below, the judgment of the trial court will be affirmed.

## Facts and Course of Proceedings

{¶ 2} On December 29, 2016, the Montgomery County Grand Jury returned an indictment charging Verdell with one count of murder, two counts of felony murder, two counts of felonious assault, and one count of tampering with evidence. With the exception of tampering with evidence, all the charges included a three-year firearm specification. The charges stemmed from allegations that Verdell shot and killed his friend Stephan Shyne during a physical altercation and then disposed of the firearm he used in the shooting.

{¶ 3} After pleading not guilty to the charges, Verdell filed a motion to suppress incriminating statements that he made to law enforcement. In the motion, Verdell argued that the incriminating statements should have been suppressed because they were either not preceded by *Miranda* warnings or were made after an involuntary waiver of his *Miranda* rights. The trial court held a hearing on the motion, during which the State

presented testimony from Officer Jeremy Stewart and Detective Rod Roberts of the Dayton Police Department.

{¶ 4} Officer Stewart testified that at approximately 1 a.m. on December 20, 2016, he and his partner, Officer Swagger, were dispatched to the scene of a car accident on Westdale Court in Dayton, Ohio. The accident in question involved a vehicle that contained Shyne's body. Police officers discovered Shyne dead in the vehicle with multiple gunshot wounds to his head.

{¶ 5} Stewart testified that several police crews were already present at the scene of the accident when he and Swagger arrived. Stewart was informed by the police crews that one or two individuals were seen leaving the vehicle, and that one of the individuals was a black male wearing all black. Stewart testified that he and Swagger decided to canvas the area in their police cruiser to look for the individuals who were seen leaving the scene of the car accident. At this time, Stewart testified that he was not aware of the shooting, but only of the car accident.

{¶ 6} Four or five blocks from the scene of the accident, Officer Stewart observed a black male, later identified as Verdell, walking down the street wearing all black with snow and dirt on his back. Without activating his cruiser's lights or sirens, Stewart ordered Verdell to stop. Verdell complied with Stewart's order and stopped walking. Thereafter, Stewart conducted a pat-down search on Verdell for purposes of officer safety. Stewart testified that he found no weapons on Verdell, but noticed that Verdell had blood on his nose and mouth and scratches on his face. Upon seeing the injuries to Verdell's face, Stewart testified that he had reason to believe that Verdell was somehow involved in the car accident.

{¶ 7} In addition to noticing Verdell's injuries, Officer Stewart testified that he detected the odor of an alcoholic beverage on Verdell's person. Stewart testified that on a scale from one to ten, he believed Verdell's level of intoxication was at a five. Verdell also appeared intoxicated in video footage taken from Stewart's cruiser camera. *See* State's Exhibit No. 1. In the video, Stewart can be heard describing Verdell as "drunk" with "his face all busted up." *Id.*

{¶ 8} After conducting a pat-down search on Verdell, Officer Stewart testified that he handcuffed Verdell, placed him in the back of the police cruiser, and transported him to the scene of the car accident. In doing so, neither Stewart nor Swagger explained to Verdell why he was being handcuffed or where he was being transported. Stewart, however, testified that he handcuffed Verdell for purposes of officer safety because he did not know Verdell's involvement in the car accident. Stewart also testified that he transported Verdell to the scene of the car accident so that Verdell could be examined by medics. It is undisputed that Stewart did not *Mirandize* Verdell before placing him in the police cruiser. Stewart testified that he did not *Mirandize* Verdell because Verdell was not under arrest.

{¶ 9} Upon returning to the scene of the car accident, Stewart was advised by another officer that a shooting had occurred. Stewart thereafter obtained a medic to examine Verdell. The video evidence shows Verdell speaking to the medic while sitting handcuffed in the back seat of Stewart's police cruiser. The medic spoke to Verdell through an open door of the cruiser; however, the other doors to the cruiser were shut and locked. Stewart testified that under these circumstances, Verdell would not have been able to leave the cruiser even if he had wanted to do so.

{¶ 10} In the video evidence, the medic can be heard asking Verdell if he was injured. In response, Verdell told the medic his nose was bleeding and that he wanted to go home and to the hospital. When the medic asked Verdell what happened to his nose, Verdell explained that he got into a fight. The medic then asked Verdell, "Then what happened?" to which Verdell responded, "That's how he got killed." Officer Stewart then asked Verdell "Who hit you in the fight?" Verdell responded to Stewart's question by stating "him" while motioning toward the vehicle where Shyne was located. Stewart asked Verdell, "Then what happened?" and Verdell responded, "I shot him." *See* State's Exhibit No. 1. Stewart testified that Verdell was not under arrest at the time Verdell made these incriminating statements. Stewart also testified that when he asked Verdell "Who hit you in the fight?" and "Then what happened?" he did not suspect that Verdell was involved in the shooting.

{¶ 11} After Verdell confessed to shooting Shyne, Stewart and Swagger transported Verdell to the hospital. According to Stewart, he did not ask Verdell any questions about the car accident or the shooting while transporting Verdell to the hospital. Once at the hospital, Stewart remained with Verdell as he was examined by medical staff. Stewart testified that he also did not ask Verdell any questions about the car accident or the shooting while Verdell was being treated at the hospital.

{¶ 12} Following Verdell's discharge from the hospital, Officer Stewart transported Verdell to the police station. While transporting Verdell to the police station, Stewart once again testified that he did not ask Verdell any questions about the car accident or the shooting. After arriving at the police station, Verdell was interviewed by Detective Roberts. Verdell's interview with Roberts started approximately three hours after Verdell

was initially found and picked up by Stewart and Swagger.

{¶ 13} Detective Roberts testified that he was aware Verdell had been treated at the hospital just prior to the interview. During the interview, Roberts observed that Verdell was limping slightly and had blood around the right side of his nose and mouth and scratches on his forehead. Roberts also testified that Verdell complained of skinned knees. Despite observing these injuries, Roberts testified that he was not concerned about Verdell's physical or mental ability to be interviewed.

{¶ 14} Detective Roberts testified that he saw the discharge paperwork from the hospital and was aware that Verdell's injuries required no follow-up treatment. Roberts also testified that Verdell was alert, coherent, and able to provide all his personal information without difficulty. Roberts further testified that Verdell did not appear to be intoxicated. Although Roberts testified that Verdell spoke somewhat slowly during the interview, Roberts was unsure whether that was Verdell's normal speech pattern. According to Roberts, Verdell responded to questions in a logical, coherent manner and understood why he was being interviewed.

{¶ 15} Continuing, Detective Roberts testified that before questioning Verdell, he had Verdell read aloud his *Miranda* rights that were listed on a pre-interview form. A video recording of the interview confirmed that Verdell read aloud the first *Miranda* right on the form. *See* State's Exhibit No. 2. Thereafter, Roberts read the remaining rights to Verdell, which Verdell indicated he understood. Roberts then read the waiver section of the pre-interview form aloud to Verdell, which stated in part, "no pressure or coercion of any kind has been used against me." *See* State's Exhibit No. 3. Although Verdell told Roberts that he did not know what the word "coercion" meant, Roberts subsequently

defined that term for Verdell, and Verdell indicated an understanding of the definition. Verdell then agreed to waive his *Miranda* rights as evidenced by his signing the pre-interview form.

**{¶ 16}** Following Verdell's waiver of his *Miranda* rights, Roberts conducted an interview with Verdell that elicited incriminating statements regarding the car accident and the shooting. Specifically, Verdell admitted that he and Shyne had been drinking and driving around in the vehicle involved in the accident. Verdell claimed that he was initially in the backseat of the vehicle, but later moved up to the front-passenger seat next to Shyne, who was driving. According to Verdell, he and Shyne began to argue because Shyne answered Verdell's cell phone and made rude comments to Verdell's girlfriend. Verdell claimed the argument turned physical after Shyne punched him in the face. Verdell admitted that he punched Shyne in retaliation, grabbed a firearm, and shot Shyne multiple times. Verdell claimed he then exited the vehicle and disposed of the firearm by walking to a nearby alley and throwing the firearm down a hill.

**{¶ 17}** Following the suppression hearing, the trial court issued a written decision overruling Verdell's motion to suppress. In so holding, the trial court found that the incriminating statements Verdell made to Officer Stewart in the police cruiser did not require *Miranda* warnings because Verdell was not subject to a custodial interrogation at the time the statements were made. The trial court also found that Verdell had knowingly, intelligently, and voluntarily waived his *Miranda* rights before making incriminating statements to Detective Roberts.

**{¶ 18}** After the trial court overruled his motion to suppress, Verdell entered a no contest plea to all the charges and specifications in the indictment. The trial court

accepted Verdell's no contest plea and found him guilty of all the charges and specifications. At sentencing, the trial court merged several of Verdell's offenses and sentenced Verdell to an aggregate prison term of 18 years to life.

{¶ 19} Verdell now appeals from his conviction, raising two assignments of error for review that challenge the trial court's decision overruling his motion to suppress. Verdell's assignments of error are as follows:

I. STATEMENTS OBTAINED ON THE SCENE WERE INADMISSIBLE AS THE OFFICER CIRCUMVENTED MIRANDA BY ASKING QUESTIONS DURING THE APPELLANT'S CONVERSATION WITH THE MEDIC.

II. MR. VERDELL DID NOT KNOWINGLY AND VOLUNTARILY WAIVE HIS MIRANDA RIGHTS AT THE SAFETY BUILDING.

## Standard of Review

{¶ 20} "In ruling on a motion to suppress, the trial court 'assumes the role of the trier of fact, and, as such, is in the best position to resolve questions of fact and evaluate the credibility of the witnesses.' " *State v. Prater*, 2012-Ohio-5105, 984 N.E.2d 36, ¶ 7 (2d Dist.), quoting *State v. Retherford*, 93 Ohio App.3d 586, 592, 639 N.E.2d 498 (2d Dist.1994). "As a result, when we review suppression decisions, 'we are bound to accept the trial court's findings of fact if they are supported by competent, credible evidence. Accepting those facts as true, we must independently determine as a matter of law, without deference to the trial court's conclusion, whether they meet the applicable legal standard.' " *Id.*, quoting *Retherford*.

**First Assignment of Error**

{¶ 21} Under his First Assignment of Error, Verdell contends the incriminating statements he made in response to Officer Stewart's questions at the crime scene should have been suppressed by the trial court because those statements were not preceded by *Miranda* warnings.   We disagree with Verdell's claim.

{¶ 22} "The right to [*Miranda*] warnings is grounded in the Fifth Amendment's prohibition against compelled self-incrimination."   *State v. Strozier*, 172 Ohio App.3d 780, 2007-Ohio-4575, 876 N.E.2d 1304, ¶ 16 (2d Dist.), citing *Moran v. Burbine*, 475 U.S. 412, 420, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986).   "It is well established, however, that the police are not required to administer [*Miranda*] warnings to every individual they question."   *Id.*, citing *State v. Biros*, 78 Ohio St.3d 426, 440, 678 N.E.2d 891 (1997). "Rather, only custodial interrogations trigger the need for [*Miranda*] warnings."   *Id.*, citing *Biros* at 440.   (Other citations omitted.)

{¶ 23} " 'Custodial interrogation' means questioning initiated by the police after the person has been taken into custody or otherwise deprived of his freedom to the degree associated with a formal arrest."   (Citations omitted.)   *State v. Vineyard*, 2d Dist. Montgomery No. 25854, 2014-Ohio-3846, ¶ 32; *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983), quoting *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977) ("the ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest").

{¶ 24} Although Verdell argues that he was deprived of his freedom of movement

to a degree associated with a formal arrest, in order to trigger the need for *Miranda* warnings, Verdell must have been subject to an interrogation at the time his freedom was so restrained. " 'Interrogation' includes express questioning as well as 'any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.' " *Strozier* at ¶ 20, quoting *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). *Accord State v. Knuckles*, 65 Ohio St.3d 494, 605 N.E.2d 54 (1992), paragraph two of the syllabus ("[w]hen a statement, question or remark by a police officer is reasonably likely to elicit an incriminating response from a suspect, it is an interrogation").

{¶ 25} " 'Interrogation' must reflect 'a measure of compulsion above and beyond that inherent in custody itself.' " *State v. Haynes,* 2018-Ohio-607, 106 N.E.3d 342, ¶ 16 (2d Dist.)*,* quoting *Innis* at 300. "[S]ince the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response." (Emphasis sic.) *Innis* at 301-302. Therefore, "[p]olice officers are not responsible for unforeseeable incriminating responses." (Citation omitted.) *State v. Waggoner*, 2d Dist. Montgomery No. 21245, 2006-Ohio-844, ¶ 14.

{¶ 26} In *Waggoner*, the defendant was traveling in a vehicle with some companions when he was stopped and arrested on an outstanding warrant. *Id.* at ¶ 2-3. After the defendant's arrest, the arresting officer saw a cell phone and jacket on the seat of the vehicle where the defendant had been sitting and asked the defendant whether the

items were his belongings. *Id.* at ¶ 4. The defendant replied that the items were his, and the officer asked "if there was any other property (of his) in the vehicle." *Id.* In response, the defendant said there was a gun in the vehicle. *Id.* After the gun was found, the defendant was charged with carrying a concealed weapon. *Id.* at ¶ 5.

{¶ 27} The trial court in *Waggoner* suppressed evidence of the gun and the defendant's statement concerning the gun on grounds that an un-*Mirandized* custodial interrogation occurred. *Id.* In so holding, the trial court found the arresting officer's question was an interrogation because it was reasonably likely to elicit the incriminating response given by the defendant. *Id.* The State appealed from the trial court's decision and we reversed it. Specifically, we found that the record did not support finding that the arresting officer should have known that when he asked the defendant whether there was "any other property (of his) in the vehicle," he would have elicited an incriminating response from the defendant. *Id.* at ¶ 20. Thus, we held that *Miranda* warnings were not required to precede the officer's question as to whether the defendant had any other property in his vehicle. *Id. See also State v. Reindel*, 2017-Ohio-28, 80 N.E.3d 1098 (2d Dist.), ¶ 19 (holding there was "no basis to conclude that [the officer] should have known that his innocuous questions were reasonably likely to elicit an incriminating response from [the defendant]").

{¶ 28} The situation in the present case is similar to that in *Waggoner*. In this case, the record does not support finding that Officer Stewart should have known that when he asked Verdell "Who hit you in the fight?" and "Then what happened?" that Verdell would have confessed to shooting Shyne. The fact that Stewart's questions were asked during a medic's evaluation and that the questions did not reference the shooting indicate

that Stewart was trying to determine how Verdell was injured, not to elicit an incriminating response. This conclusion is supported by Stewart's testimony that he did not suspect Verdell was involved in the shooting at the time he questioned him. Because the record indicates there was no way for Stewart to know that his questions would elicit Verdell's incriminating response, we do not find that Stewart's questions rose to the level of interrogation. Rather, the record indicates that Stewart's questions amounted to general on-the-scene fact finding, which generally does not constitute a custodial interrogation. *Miranda v. Arizona*, 384 U.S. 436, 477-478, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

**{¶ 29}** Given that Verdell was not interrogated by Officer Stewart, there was clearly no custodial interrogation that triggered the need for *Miranda* warnings. Therefore, Verdell's claim that the trial court erred in failing to suppress the incriminating statements because they were not preceded by *Miranda* warnings lacks merit, as *Miranda* warnings were not required.

**{¶ 30}** Verdell's First Assignment of Error is overruled.

**Second Assignment of Error**

**{¶ 31}** Under his Second Assignment of Error, Verdell contends the incriminating statements he made during his interview with Detective Roberts should have been suppressed by the trial court. In support of this claim, Verdell argues that he did not knowingly, intelligently, and voluntarily waive his *Miranda* rights prior to the interview. Verdell claims his *Miranda* waiver was not knowing, intelligent, and voluntary because he was physically injured and intoxicated at the time of the waiver. We once again disagree with Verdell's claim.

**{¶ 32}** "In order for a waiver of the rights required by [*Miranda*] to be valid, the State bears the burden of demonstrating a knowing, intelligent, voluntary waiver based upon the totality of the facts and circumstances surrounding the interrogation." *State v. Dotson*, 2d Dist. Clark No. 97-CA-0071, 1997 WL 822694, *7 (Nov. 21, 1997), citing *Moran*, 475 U.S. 412, 106 S.Ct. 1135, 89 L.Ed.2d 410. In considering the totality of the facts and circumstances, we look at "the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement." *State v. Edwards*, 49 Ohio St.2d 31, 358 N.E.2d 1051 (1976), paragraph two of the syllabus, *overruled on other grounds*, 438 U.S. 911, 98 S.Ct. 3147, 57 L.Ed.2d 1155 (1978).

**{¶ 33}** "What is essential is that the defendant have a full awareness of the nature of the constitutional rights being abandoned and the consequences of his decision to abandon them, and that the waiver not be the product of official coercion." *Dotson* at *7, citing *Moran*. " 'An express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver * * *.' " *State v. Belton*, 149 Ohio St.3d 165, 2016-Ohio-1581, 74 N.E.3d 319, ¶ 106, quoting *North Carolina v. Butler*, 441 U.S. 369, 373, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979).

**{¶ 34}** Intoxication will not render a defendant's waiver of his *Miranda* rights invalid unless his ability to reason is sufficiently impaired. *State v. Monticue*, 2d Dist. Miami No. 06-CA-33, 2007-Ohio-4615, ¶ 12, citing *State v. Stewart*, 75 Ohio App.3d 141, 147, 598 N.E.2d 1275 (11th Dist.1991). In *State v. West*, 2d Dist. Montgomery No. 23547, 2010-Ohio-1786, we found that the "[d]efendant clearly exhibited behavior consistent with a person who is intoxicated," but nevertheless held that the record "supports the conclusion

that [d]efendant's ability to reason was not so impaired that she was unable to understand her [*Miranda*] rights or the consequences of waiving them." *Id.* at ¶ 17. *Accord State v. Gray-Mosher*, 2018-Ohio-1422, 101 N.E.3d 729, ¶ 7 (2d Dist.) (holding that "[e]ven if we accept that [defendant] was intoxicated at the time of the assault and had emotional or mental problems, he appeared to be lucid at the time of the interview, which occurred roughly fifteen hours after the assault" and nothing in the record "suggests that [defendant] lacked an understanding of his *Miranda* rights or the capacity to waive them"); *State v. Lewis*, 10th Dist. Franklin No. 97APA09-1263, 1998 WL 418913, *2 (July 21, 1998) (holding that "[a]bsent any evidence that the appellant's reasoning was impaired by drugs or alcohol, intoxication of a defendant will not invalidate a confession").

{¶ 35} In this case, the record does not establish that Verdell's physical injuries or intoxication prevented him from knowingly, intelligently, and voluntarily waiving his *Miranda* rights. Although Verdell waived his *Miranda* rights at an interview that occurred immediately after he was released from the hospital, the video evidence establishes that Verdell functioned in a normal manner during the interview and did not ask to stop the interview at any time due to pain or discomfort. As noted by Detective Roberts, Verdell suffered from a slight limp, wounds to his face, and skinned knees. Nothing in the record indicates that these injuries prevented Verdell from understanding his *Miranda* rights or from knowingly, intelligently, and voluntarily waiving those rights.

{¶ 36} While Verdell appeared intoxicated at the time he was found and picked up by Officers Stewart and Swagger, the video evidence establishes that Verdell was nevertheless lucid at the time of his interview with Detective Roberts, which occurred three hours later. Verdell appeared alert and coherent during the interview and had no

difficulty understanding Detective Roberts's questions or providing requested information. This is true despite the fact that Verdell spoke somewhat slowly and was animated at times. Nothing in the video evidence suggested that Verdell lacked an understanding of his *Miranda* rights or the capacity to waive them. Indeed, the video evidence demonstrated that Verdell understood his *Miranda* rights after they were provided to him both orally and in writing. Verdell thereafter agreed to waive his *Miranda* rights and signed a written waiver, which was a strong indication that Verdell's waiver was knowing, intelligent, and voluntary. *See Belton*, 149 Ohio St.3d 165, 2016-Ohio-1581, 74 N.E.3d 319, at ¶ 106.

**{¶ 37}** We also note that there is nothing in the record indicating that Verdell's *Miranda* waiver was anything but a free and deliberate choice made without intimidation, coercion, or deception. The record indicates that Verdell suffered no physical deprivation or mistreatment during the one-hour interview with Detective Roberts. The record also indicates that Detective Roberts made no threats or promises to Verdell during the interview. Verdell, who at the time of the interview was a 27-year-old high school graduate with prior experience in the criminal justice system, did not establish that the waiver of his *Miranda* rights was anything other than a knowing, intelligent, and voluntary decision.

**{¶ 38}** For the foregoing reasons, we find that Verdell's waiver of his *Miranda* rights was knowing, intelligent, and voluntary. Therefore, the trial court did not err in failing to suppress the incriminating statements Verdell made to Detective Roberts following his *Miranda* waiver.

**{¶ 39}** Verdell's Second Assignment of Error is overruled.

## Conclusion

**{¶ 40}** Having overruled both of Verdell's assignments of error, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

FROELICH, J. and TUCKER, J., concur.

Copies sent to:

Mathias H. Heck, Jr.
Heather N. Jans
Amy E. Ferguson
Hon. Barbara P. Gorman