[Cite as *State v. Stokes*, 2023-Ohio-1164.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Appellee | : | C.A. No. 29560 |
| | : | |
| v. | : | Trial Court Case No. 2021 CR 03687 |
| | : | |
| CRYSTAL STOKES | : | (Criminal Appeal from Common Pleas |
| | : | Court) |
| Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on April 7, 2023

. . . . . . . . . . .

MATHIAS H. HECK, JR., by ELIZABETH A. ELLIS, Attorney for Appellee

KRISTIN L. ARNOLD, Attorney for Appellant

. . . . . . . . . . . .

WELBAUM, P.J.

{¶ 1} Defendant-Appellant, Crystal Stokes, appeals her conviction on one count of aggravated vehicular homicide (reckless) and failure to stop after an accident, both of which were third-degree felonies. Following a no-contest plea to the charges, the court found Stokes guilty and sentenced her to five years in prison for the vehicular homicide

and 36 months for failure to stop. These were maximum terms. The court also imposed consecutive terms, for a total eight-year prison sentence.

{¶ 2} According to Stokes, the trial court erred in overruling her motion to suppress because she was intoxicated at the time of the police interrogation and, therefore, lacked the capacity to knowingly, intelligently, and voluntarily waive her constitutional rights.

{¶ 3} After reviewing the record, we find the assignment of error without merit. Accordingly, the trial court's judgment will be affirmed.

I.   Facts and Course of Proceedings

{¶ 4} On November 15, 2021, an indictment was filed charging Stokes with one count of aggravated vehicular homicide, a third-degree felony; failure to stop after an accident, also a third-degree felony; and vehicular homicide, a first-degree misdemeanor. The charges arose from an automobile accident that occurred on November 3, 2021. Stokes was driving an automobile at the time that caused the death of Tracie Taylor, who had been romantically involved with Stokes's boyfriend, Johnny Walton. Stokes also fled from the scene after the accident.

{¶ 5} On November 18, 2021, Stokes pled not guilty to the charges, and an attorney was appointed for her. The same day, the court set a $100,000 cash or surety bond. After Stokes filed a motion to reconsider the bond, the court filed an entry on December 10, 2021, ordering bond to continue as previously set. On December 14, 2021, Stokes filed a motion seeking a competency evaluation of her current mental condition, and the court ordered an evaluation. The court also ordered Stokes to appear

in court on February 8, 2022, for a forensic report.

{¶ 6} On December 27, 2021, the court appointed new counsel for Stokes. New counsel filed another request for bail reconsideration, but the court again ordered bail to continue as previously set.

{¶ 7} On February 8, 2022, the court found Stokes competent to stand trial based on the stipulated contents of a report from the Forensic Psychiatry Center. The same day, Stokes filed a motion to suppress all oral statements she had made. Stokes claimed she had not been adequately advised of her *Miranda* rights and did not knowingly, intelligently, and voluntarily waive her rights. After the court held an evidentiary hearing on the suppression motion in April 2022, Stokes filed a supplemental memorandum in support of suppression, and the State responded. On May 25, 2022, the court filed an order setting a final pretrial for September 6, 2022, and trial for September 19, 2022.

{¶ 8} On July 9, 2022, Stokes appeared before the court to enter a plea based on a plea agreement. Before accepting the plea, the trial court noted that it had not yet filed a decision on the suppression motion due to the length of time left before the scheduled trial. However the court said it would verbally deny the motion at that time so Stokes would be aware of the decision before pleading. The court also said it would issue a more detailed written decision later, and Stokes's counsel agreed to this. Transcript of Proceedings (Motion to Suppress/Plea/& Sentencing) ("Tr"), p. 45-47.

{¶ 9} Under the plea agreement, Stokes would plead no contest to the charges of aggravated vehicular homicide and failure to stop at the scene of an accident, and the misdemeanor charge would be dismissed. In addition, the plea was "open" as to the

sentence. *Id.* at p. 45. After the court conducted a Crim.R. 11 colloquy, Stokes pled no contest to the charges. The court accepted the plea, found Stokes guilty, ordered a presentence investigation, and set sentencing for August 2, 2022. *Id.* at p. 46 and 48-62.

{¶ 10} The court filed a written decision overruling the motion to suppress on July 18, 2022. At the sentencing hearing on August 2, 2022, the court imposed maximum and consecutive sentences for a total prison term of eight years. This timely appeal followed.

## II. Alleged Error in Denying Suppression

{¶ 11} Stokes's sole assignment of error states that:

The Trial Court Violated Defendant-Appellant's Due Process Rights and Privilege Against Self-Incrimination Under State and Federal Constitutions by Denying Defendant-Appellant's Motion to Suppress and Finding Her Statements to be Knowingly, Intelligently, and Voluntar[ily Made].

{¶ 12} Stokes contends that her *Miranda* waiver was not knowingly, intelligently, and voluntarily made because she was intoxicated at the time. In this regard, Stokes points out that her actions before being interrogated had been erratic, that she had asked to go to a rehabilitation center during administration of her *Miranda* rights, and that she told the interviewing detective she had been awake for days on end. Given these facts, Stokes argues that the police should have asked her before her interview if she had

ingested illegal drugs. However, she claims they did not ask.

{¶ 13} In denying suppression, the trial court found the testimony of the police officers "highly credible" and "consistent with the video evidence." Decision, Order and Entry Denying Defendant's Motion to Suppress Evidence (July 18, 2022) ("Decision"), p. 1. The court found that the police had fully explained the *Miranda* rights and treated Stokes professionally and courteously. *Id.* at p. 2. In addition, the court rejected Stokes's intoxication argument, noting that Stokes had been coherent and oriented, although emotional at times, and was able to tell a story that changed over time, which indicated "a cognitive ability clear enough to divert responsibility to others." *Id.* at p. 3.

{¶ 14} The review standards for suppression decisions are well-settled. "Appellate review of a motion to suppress presents a mixed question of law and fact. When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses." *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8, citing *State v. Mills*, 62 Ohio St.3d 357, 366, 582 N.E.2d 972 (1992). "Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence. * * * Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." (Citations omitted.) *Id.*

{¶ 15} Concerning the legal standards that apply to interrogation, "[t]he Fifth Amendment to the United States Constitution and Article I, Section 10 of the Ohio

Constitution declare that no person shall be compelled in any criminal case to be a witness against himself." *State v. Arnold*, 147 Ohio St.3d 138, 2016-Ohio-1595, 62 N.E.3d 153, ¶ 30. "Pursuant to *Miranda*, 'the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination.' " *State v. Jackson*, 154 Ohio St.3d 542, 2018-Ohio-2169, 116 N.E.3d 1240, ¶ 14, quoting *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

{¶ 16} In *Miranda*, the court stressed that "without proper safeguards the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." *Miranda* at 467. Based on this inherent coercion, "*Miranda* established 'a set of prophylactic measures' to safeguard the constitutional privilege against self-incrimination." *State v. Barker*, 149 Ohio St.3d 1, 2016-Ohio-2708, 73 N.E.3d 365, ¶ 22, quoting *J.D.B. v. North Carolina*, 564 U.S. 261, 269, 131 S.Ct. 2394, 180 L.Ed.2d 310 (2011).

{¶ 17} "In broad terms, *Miranda* held that the state may not use a defendant's statements from custodial interrogation 'unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination.' " *Id.*, quoting *Miranda* at 444. "Prior to questioning, the police must warn the suspect 'that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.' "

*Id.* "The Supreme Court recognized the importance of a suspect's 'real understanding' of his rights and his intelligent decision whether to exercise them." *Id.*, quoting *Miranda* at 469.

{¶ 18} "If custodial interrogation continues in the absence of an attorney after a police officer advises a suspect of his rights, the government bears 'a heavy burden' to demonstrate by a preponderance of the evidence that the suspect 'knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel' before speaking to the police." *Id.* at ¶ 23, quoting *Miranda* at 475. (Other citations omitted.)

{¶ 19} To decide if a valid waiver occurred, courts " 'consider the totality of the circumstances, including the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement.' " *State v. Wesson*, 137 Ohio St.3d 309, 2013-Ohio-4575, 999 N.E.2d 557, ¶ 35, quoting *State v. Edwards*, 49 Ohio St.2d 31, 358 N.E.2d 1051 (1976), paragraph two of the syllabus. The Supreme Court of Ohio has held that "a wavier is not involuntary *unless* there is evidence of police coercion, such as physical abuse, threats, or deprivation of food, medical treatment, or sleep." (Emphasis sic.) *Id.*, citing *State v. Cooey*, 46 Ohio St.3d 20, 28, 544 N.E.2d 895 (1989). " 'An express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof' " of the waiver's validity. *State v. Belton*, 149 Ohio St.3d 165, 2016-Ohio-1581, 74 N.E.3d 319, ¶ 106, quoting *North Carolina v. Butler*, 441 U.S. 369, 373, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979).

{¶ 20} In the specific context of intoxication, we have said that it "will not render a defendant's waiver of his *Miranda* rights invalid unless his ability to reason is sufficiently impaired." *State v. Verdell*, 2d Dist. Montgomery No. 27786, 2018-Ohio-4766, ¶ 34, citing *State v. Monticue*, 2d Dist. Miami No. 2006-CA-33, 2007-Ohio-4615, ¶ 12.

{¶ 21} To decide whether the trial court's decision was correct, we have reviewed the entire record, which includes: the suppression hearing transcript; videos of Stokes's initial encounter with the police and her subsequent transport for an interview; videos of the interrogation; and the pre-interview form that Stokes signed. Having done so, we agree with the trial court's decision to deny suppression.

{¶ 22} Two police officers testified at the hearing, and Stokes did not present any evidence. The evidence was as follows. On November 4, 2021, a city of Dayton police officer, Daniel Perry, was working in patrol operations and with the Mobile Crisis Response Team. Tr. at p. 6-7. At around 6:50 a.m., Perry was in the area of East 5th Street and Ludlow Street, due to a call for service. The call for service was based on the suspicious circumstance of a male chasing a female. *Id.* at p. 8. Initially, the call stated that these individuals were in the Oregon District; later, the call was updated to reveal different locations in downtown Dayton. The information Perry received was that the male was trying to restrain the female and she was trying to get away. *Id.* at p. 8-9.

{¶ 23} Eventually, while driving westbound on 5th Street, Perry saw a man in the middle of the street, walking, and a woman on the street's south side, running. The man directed him toward the woman (later identified as Stokes), and she began running north across the street. *Id.* at p. 9. Perry exited his cruiser, called over the radio that Stokes

was running, threw up his hands in the air, and asked Stokes why she was running. At that point, Stokes walked back to the cruiser and literally jumped into the back seat. *Id.* at p. 10. Perry did not handcuff her because he did not know what was going on. *Id.* He did not know if a domestic situation was involved, and he just wanted to get Stokes to safety. *Id.* at p. 11. At the time, Perry had no knowledge about who a potential victim or suspect might be. *Id.*

**{¶ 24}** The male (later identified as Johnny Walton) eventually calmed down and gave Perry a breakdown of what was going on. *Id.* at p. 10-11 and 21. Perry then got in the cruiser, asked Stokes what her name was, and she said, "Just take me to jail. Just take me to jail." *Id.* at p. 12. At that moment, Perry received a call from a deputy with Traffic Services who asked if he had Johnny and Crystal, and Perry said yes. Perry was then instructed to take Stokes to the second floor of the Safety Building, to homicide. Another officer arrived and took Walton also to an interview room at the Safety Building. *Id.* at p. 12-13.

**{¶ 25}** After Stokes entered the cruiser, Perry asked her for her name and address and basic information, but he did not ask her any questions about the incident. Stokes was not handcuffed, and he did not tell her that she was under arrest. Perry also did not make any threats or promises to Stokes, nor did Stokes ask for an attorney. *Id.* at p. 16-17. After they arrived at the Safety Building, Perry took Stokes upstairs to an interview room. He stayed in the area but was not in the interview room while Stokes was being questioned. When the interview ended, Stokes was placed under arrest, and Perry was told to take her to the jail for murder. *Id.* at p. 18-20.

{¶ 26} A Dayton Police Department homicide detective, Melissa Schloss, was one of the people who interviewed Stokes on November 4, 2021. Tr. at p. 26-27. The entire encounter was recorded, even when the police were not present in the interview room with Stokes. *Id.* at p. 27-28 and State's Ex. 1. When Schloss first met with Stokes, Stokes was very quiet and soft-spoken. Stokes appeared coherent. *Id.* at p. 28. Schloss wondered if Stokes were under the influence of anything when they first met, because Stokes's voice was so quiet and because of the way Stokes was acting. However, Stokes responded appropriately, and Schloss did not smell anything. *Id.* at p. 29.

{¶ 27} During the hearing, Schloss first testified that she asked Stokes if she were under the influence of anything. Later, Schloss said she did not specifically ask Stokes if she had used drugs before arriving at the Safety Building. *Id.* at p. 29 and 33. However, the video indicated that Schloss did actually ask Stokes if she had been doing drugs. Stokes did not answer the question and said only that she had been thrown out of her house, had been sleeping in her car, and had been up for three days. *See* State's Ex. 1, Stokes Interview, Video 1. During the interview, Stokes later commented that she had done methamphetamine two days earlier. Schloss did recall during the hearing that, when they began the interview, Stokes said she had been up for days. Tr. at p. 33.

{¶ 28} During the course of the interview, Schloss did not ever become concerned that Stokes was under the influence of anything such that she could not understand her rights or what was going on. Stokes appeared to be coherent throughout the interview. *Id.* During her 14-year employment in law enforcement and eight years as a detective,

Schloss had encountered people who were under the influence to the point that it interfered with their ability to understand what they were doing. In situations where someone was not sober enough to be interviewed, Schloss would wait until the person was sober. *Id.* at p. 27 and 39-40.

{¶ 29} Schloss began the interview by reading *Miranda* rights to Stokes. Schloss did that using a form (State's Ex. 2), which was a pre-interview form. *Id.* at p. 29-30. According to Schloss, Stokes appeared to understand the rights that were given to her and did not display any confusion about the questions. Schloss read the rights to Stokes but did not have her initial each right. Instead, she verbally asked Stokes if she understood, and Stokes indicated that she did. *Id.* at p. 35-36. When Schloss got to the wavier part of the form, she asked Stokes to read it aloud. *Id.* at p. 37.

{¶ 30} Stokes did not ever ask to speak to an attorney or invoke her right to remain silent. Tr. at p. 30. In addition, no one made any promises or threats during the interview, which lasted about two hours and ten minutes. *Id.* at p. 31. The police also did not deny Stokes any comfort breaks. *Id.* Before going into the recorded interview, Stokes was in another interview room for about two hours. *Id.* at p. 32. No one was in there with Stokes; she was just waiting to be taken to the recorded interview room. *Id.*

{¶ 31} During the interview (which we have watched), Stokes told various versions of the event, ranging from claims that someone had stolen her car to admitting she had been the driver but contending that her car had been malfunctioning. *See* State's Ex. 1, Stokes Interview at Video 1 and 2. The trial court, therefore, was correct in noting that while Stokes claimed she had been intoxicated, she had had "sufficient cognitive ability

clear enough to attempt to divert responsibility for the accident to others." Decision at p. 3. As the court also noted, the police officers' testimony was consistent with the videos. *Id.* at p. 2.

**{¶ 32}** While Stokes was emotional at times when being interviewed by Detective Schloss, there were no signs of impairment, and Stokes coherently responded to questions. Accordingly, there was no basis for the claim that Stokes was sufficiently impaired to render her waiver invalid, and there was no evidence that the *Miranda* waiver was not voluntarily, knowingly, and intelligently made. *See Verdell,* 2d Dist. Montgomery No. 27786, 2018-Ohio-4766, at ¶ 34. Accordingly, Stokes's sole assignment of error is overruled.

## III.   Conclusion

**{¶ 33}** Stokes's assignment of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . .

TUCKER, J. and LEWIS, J., concur.