[Cite as *State v. Sellars*, 2020-Ohio-2853.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | Appellate Case Nos. 28031 & 28032 |
| Plaintiff-Appellee | : | |
| | : | Trial Court Case Nos. 2017-CR-2573/2 & 2017-CR-2432/2 |
| v. | : | |
| | : | |
| RANDY L. SELLARS JR. | : | (Criminal Appeal from Common Pleas Court) |
| | : | |
| Defendant-Appellant | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 8th day of May, 2020.

. . . . . . . . . .

MATHIAS H. HECK JR. by HEATHER N. KETTER, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, 5th Floor, Dayton, Ohio 45422
      Attorney for Plaintiff-Appellee

ALEX F. KOCHANOWSKI, Atty. Reg. No. 0090940, 6302 Kincaid Road, Cincinnati, Ohio 45213
      Attorney for Defendant-Appellant

. . . . . . . . . . . .

FROELICH, J.

{¶ 1} After Randy L. Sellars Jr.[1] entered a plea of no contest to all charges in two cases, the trial court found him guilty and imposed sentences totaling 20 years. Sellars appeals from the final judgment in both cases, asserting that the trial court erred by denying his motion to suppress evidence, that he received ineffective assistance of counsel, and that his sentence was excessive and violated due process. The judgments of the trial court will be affirmed.

**Factual and Procedural Background**

{¶ 2} On August 1, 2017, the West Carrollton Police Department received a report of a suspicious person trespassing on private property. Responding separately to the address given in the resulting dispatch, Officers Matt Harper and Joseph O'Brien found Sellars asleep inside a barn on the property. When awakened, Sellars gave Officer Harper permission to search through his (Sellars's) belongings. A background check on Sellars revealed that he had outstanding warrants in Montgomery County. He then was handcuffed, read his *Miranda* rights, and placed in the back of Officer Harper's police cruiser, where Harper questioned him briefly.

{¶ 3} In the interim, Officer O'Brien contacted Detective Mark Allison to convey the officers' suspicion that items found among Sellars's possessions in the barn might pertain to some burglary cases the department was investigating. Medics also were called due to Sellars's complaints of foot pain from an earlier motorcycle accident. Det. Allison arrived shortly and questioned Sellars. Afterward, medics transported Sellars to a

---

[1] Appellant's last name appears as "Sellers" at various places throughout the appellate record and in the final judgment entry in Montgomery C.P. No. 2017-CR-2573, but the "Sellars" spelling was used in both indictments and in the final judgment entry in Montgomery C.P. No. 2017-CR-2432.

hospital, where he received pain medication for his foot injury but declined to undergo x-rays or other treatment. He left the hospital without being taken into custody.

{¶ 4} On the night of August 4, 2017, Officer Jason Kramer of the Kettering Police Department responded to a dispatch about Sellars's being pursued through a West Kettering neighborhood; Sellars apparently fled from the scene of a burglary. He eventually was apprehended and placed in the back of Officer Kramer's cruiser for transport.

{¶ 5} A series of custodial interrogations followed. In the early morning hours of August 5, 2017, Sellars was interviewed at the Moraine Police Department by Detective Sergeant James Myers of the Centerville Police Department and Detective Nathan Burns of the Moraine Police Department. During that recorded interview, Moraine Deputy Chief Jason Neubauer[2] also entered the room and posed questions. At the end of the interview, Sellars agreed to show police the locations of certain items of stolen property.

{¶ 6} Sellars thereafter was transported to the Montgomery County jail, where Sergeant Christopher Birch and Officer Jones[3] of the German Township Police Department went to question him on the morning of August 7, 2017. The interview was interrupted because Sellars was required to appear in court. However, Sgt. Birch resumed the interview later that day.

{¶ 7} Also on August 7, Detective Sergeant Jon Spencer of the Moraine Police Department conducted a separate interview of Sellars at the jail. Det. Allison of the West

---

[2] Deputy Chief Neubauer did not testify at the suppression hearing, but his identity was confirmed through the testimony of others. (*See* Tr. p. 66, 86, 173).

[3] Officer Jones did not testify at the suppression hearing and the hearing transcript does not disclose his first name. (*See* Tr. p. 56).

Carrollton police re-interviewed Sellars at the jail on August 16, 2017. Finally, on August 21, 2017, Det. Burns and Det. Sgt. Spencer again questioned Sellars at the jail.

{¶ 8} Later that month, a Montgomery County grand jury indicted Sellars in Montgomery C.P. No. 2017-CR-2432 on nine counts: one count of burglary (occupied/person present) in violation of R.C. 2911.12(A)(1), a second-degree felony (Count One); one count of burglary (occupied/criminal offense) in violation of R.C. 2911.12(A)(3), a third-degree felony (Count Two); three counts of grand theft (firearm) in violation of R.C. 2913.02(A)(1), third-degree felonies, each with a firearm specification (Counts Three, Four, Five); three counts of having weapons under disability (prior offense of violence) in violation of R.C. 2923.13(A)(2), third-degree felonies (Counts Seven, Eight, Nine); and one count of escape in violation of R.C. 2921.34(A)(1), a second-degree felony (Count Six). Counts Two, Three, Four, Five, Seven, Eight, and Nine related to events alleged to have occurred on July 24 through July 25, 2017; Count One related to events alleged to have occurred on August 1, 2017, and Count Six related to events alleged to have occurred on August 5, 2017.

{¶ 9} Sellars filed a motion to suppress evidence in Case No. 2017-CR-2432, arguing that he did not knowingly waive his right against self-incrimination or his right to counsel prior to his various interviews, and that any incriminating statements he made to the police therefore should be suppressed. Following an evidentiary hearing, the trial court denied that motion.

{¶ 10} On January 31, 2018, Sellars was indicted on 18 additional counts in Montgomery C.P. No. 2017-CR-2573: one count of receiving stolen property in violation of R.C. 2913.51(A), a fifth-degree felony (Count One); three counts of breaking and

entering (unoccupied structure) in violation of R.C. 2911.13(A), fifth-degree felonies (Counts Two, Five, Fourteen); one count of possessing drug paraphernalia in violation of R.C. 2925.14(C)(1), a fourth-degree misdemeanor (Count Three); three counts of grand theft (motor vehicle) in violation of R.C. 2913.02(A)(1), fourth-degree felonies (Counts Four, Six, Seven); three counts of burglary (occupied/criminal offense) in violation of R.C. 2911.12(A)(3), third-degree felonies (Counts Eight, Nine, Seventeen); two counts of having weapons under disability (prior offense of violence) in violation of R.C. 2923.13(A)(2), third-degree felonies (Counts Ten, Eleven); two counts of grand theft (firearm) in violation of R.C. 2913.02(A)(1), third-degree felonies, each with a firearm specification (Counts Twelve, Thirteen); two counts of petty theft in violation of R.C. 2913.02(A)(1), first-degree misdemeanors (Counts Fifteen, Eighteen); and one count of burglary (occupied structure/person present) in violation of R.C. 2911.12(A)(1), a second-degree felony (Count Sixteen). Counts One, Two, and Three related to events alleged to have occurred on August 1, 2017; Count Four related to events alleged to have occurred on July 26, 2017; Counts Five, Six, Seven, and Eight related to events alleged to have occurred on July 31, 2017 through August 1, 2017; Counts Nine, Ten, Eleven, Twelve, and Thirteen related to events alleged to have occurred on July 21, 2017 through July 24, 2017; Counts Fourteen and Fifteen related to events alleged to have occurred on August 5, 2017 through August 6, 2017; and Counts Sixteen, Seventeen, and Eighteen related to events alleged to have occurred on August 5, 2017.

{¶ 11} On May 10, 2018, pursuant to a negotiated plea agreement, Sellars entered a plea of no contest to all counts in both cases. During the plea hearing, the trial court stated its understanding that the parties' only agreement regarding the length of Sellars's

sentences was "as to a cap essentially of 30 years" (Tr. p. 144); the prosecutor, defense counsel, and Sellars himself affirmed the court's description of the plea agreement. (*Id.*) Later, the trial court advised Sellars "that the agreement between you and the State is an agreement between you and the State. It is a recommendation to this Court and it is not binding on this Court. Do you understand that?" (*Id.* at p. 164.) Sellars orally affirmed his understanding. Following a colloquy in which the court reviewed with Sellars the charges against him, the possible penalties for those offenses, his constitutional rights, his waiver of those rights, and other relevant considerations, the court accepted Sellars's no contest plea and found him guilty of all charges.

{¶ 12} After reviewing the results of a presentence investigation ("PSI"), the trial court entered final judgment in both cases. In Case No. 2017-CR-2432, the court merged Counts Three, Four, and Five, as well as Counts Seven, Eight, and Nine. The court sentenced Sellars to eight years on the Count One burglary offense; 36 months on the Count Two burglary offense; 24 months on the Count Three grand theft offense; four years on the Count Six escape offense; and 24 months on the Count Seven having weapons under disability offense, all be served consecutively. The court also merged the firearm specifications related to Counts Three, Four, and Five and further sentenced Sellars to one year actual incarceration on a single firearm specification, to be served consecutively for a total of sentence of 20 years.

{¶ 13} In Case No. 2017-CR-2573, the trial court merged Counts Ten and Eleven, as well as Counts Twelve and Thirteen. The court sentenced Sellars to 12 months on the Count One receiving stolen property offense; 12 months on each of the Count Two, Count Five, and Count Fourteen breaking and entering offenses; 30 days (in Montgomery

County jail) on the Count Three drug paraphernalia offense; 12 months on the Count Four grand theft offense; 12 months on each of the Count Six and Count Eighteen grand theft offenses; 90 days (in Montgomery County jail) on the each of the Count Seven and Count Fifteen petty theft offenses; 36 months on each of the Count Eight, Count Nine, and Count Seventeen burglary offenses; 24 months on the Count Ten having weapons under disability offense; 24 months on the Count Twelve grand theft offense; and eight years on the Count Sixteen burglary offense.

{¶ 14} The sentences for Counts Five, Eight, Ten, Twelve, Sixteen, and Seventeen were ordered to be served consecutively to one another, but concurrently to the sentences on the other counts in Case No. 2017-CR-2573, for a total of 19 years. The court also imposed a consecutive sentence of one year actual incarceration on the firearm specification to Count Twelve. The sentences in the two cases were to be served concurrently with each other. Sellars's aggregate sentence for both cases was 20 years.

{¶ 15} Sellars's original appellate attorney filed a brief pursuant to *Anders v. California*, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967), claiming to have found no issues of arguable merit. We notified Sellars that his counsel had filed an *Anders* brief and granted him 60 days to file a pro se brief. When Sellars failed to respond within that time, we independently reviewed the record, identified at least one issue of arguable merit, and appointed new counsel to represent Sellars.

{¶ 16} Sellars's current appellate attorney has filed a brief setting forth the following assignments of error:

1) The Trial Court Erred when it Overruled Mr. Sellars' Motion to suppress any and all evidence, including statements, obtained as a result of the

violation of [Sellars's] constitutional rights, and the procedural safeguards established in *Miranda.*

2) Mr. Sellars Received Ineffective Assistance of Counsel in Violation of his Sixth and Fourteenth Amendment Rights Under the Ohio and United States Constitutions, Resulting In An Unknowing and Involuntary Plea.

3) Mr. Sellars was Denied Due Process and Fair Trial During Sentencing When The Trial Court Failed to Sentence Mr. Sellars[ ] to the Statutory Minimum Based on His Personal Factors In Mitigation, Which Counsel Failed to Present, in Violation of His Fifth and Fourteenth Amendment Rights Under the Ohio and United States Constitutions.

**Assignment of Error #1 – Failure to Suppress Evidence**

{¶ 17} Sellars contends that the trial court should have suppressed statements he made to law enforcement officers because he was questioned while "under physical and mental duress" that left him unable to "make a voluntary waiver" of his constitutional rights. (Brief of Appellant, p. 3.) Specifically, he claims that he "was sleep deprived, injured, and likely very intoxicated" by pain medication at the time of his incriminating statements. (*Id.* at p. 4.) Although those broad contentions would appear to be most applicable to any statements Sellars made during his initial encounter with police on August 1, 2017, the arguments are phrased broadly and not directed to any particular date.[4] Accordingly, we will review the circumstances of each police interview with Sellars.

{¶ 18} Further, in rejecting the *Anders* brief originally filed on Sellars's behalf, this

---

[4] Only later in his brief does Sellars seemingly restrict those arguments to "statements made to law enforcement personnel *the morning after the events alleged,*" still without specifying a date. (Emphasis added.) (*See id.* at p. 4).

court identified a potential issue as to whether certain representations police officers made in order to elicit Sellars's incriminating statements may have posed a constitutional violation. We also will review that question.

### a. Standard of Review

{¶ 19} An appeal from a ruling on a motion to suppress presents a mixed question of fact and law. *State v. Ojezua*, 2016-Ohio-2659, 50 N.E.3d 14, ¶ 15 (2d Dist.), citing *State v. Koon*, 2d Dist. Montgomery No. 26296, 2015-Ohio-1326, ¶ 13, and *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. "In ruling on a motion to suppress, the trial court 'assumes the role of the trier of fact, and, as such, is in the best position to resolve questions of fact and evaluate the credibility of the witnesses.' " *State v. Moore*, 2d Dist. Montgomery No. 27973, 2019-Ohio-648, ¶ 11, quoting *State v. Retherford*, 93 Ohio App.3d 586, 592, 639 N.E.2d 498 (2d Dist.1994). As a result, when reviewing a suppression decision, this court "must accept the trial court's findings of fact if they are supported by competent, credible evidence." *Id.*, citing *Retherford* at 592. We then "must independently determine as a matter of law, without deference to the trial court's conclusion," whether the facts as found by the trial court meet the applicable legal standard. *Id.*, quoting *Retherford* at 592. "The application of law to the trial court's findings of fact is subject to a de novo standard of review." *Ojezua* at ¶ 15, quoting *State v. Turner*, 2015-Ohio-4612, 48 N.E.3d 981, ¶ 10 (2d Dist.).

### b. Law Regarding Voluntariness of Statements

{¶ 20} To ensure protection of the Fifth Amendment right against self-incrimination, statements resulting from custodial interrogations are admissible only after a showing that police followed the procedural safeguards described in *Miranda v. Arizona*,

384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). *State v. Earnest*, 2d Dist. Montgomery No. 26646, 2015-Ohio-3913, ¶ 21. Whether a statement was made voluntarily and whether an individual knowingly, voluntarily, and intelligently waived his or her *Miranda* rights are distinct issues. *State v. Eley*, 77 Ohio St.3d 174, 178, 672 N.E.2d 640 (1996); *State v. Givens*, 2d Dist. Montgomery No. 26782, 2016-Ohio-4978, ¶ 22. Regardless of whether *Miranda* warnings were required and given, a defendant's statement may have been given involuntarily and thus be subject to exclusion. *State v. Kelly,* 2d Dist. Greene No. 2004-CA-20, 2005-Ohio-305, ¶ 11.

{¶ 21} Although a defendant's statements to police after a knowing, intelligent, and voluntary waiver of the individual's *Miranda* rights are presumed to be voluntary, "[t]he *Miranda* presumption applies to the conditions inherent in custodial interrogation that compel the suspect to confess. It does not extend to any actual coercion police might engage in, and the Due Process Clause continues to require an inquiry separate from custody considerations and compliance with *Miranda* regarding whether a suspect's will was overborne by the circumstances surrounding his confession." *State v. Porter*, 178 Ohio App.3d 304, 2008-Ohio-4627, 897 N.E.2d 1149, ¶ 14 (2d Dist.), citing *Dickerson v. United States*, 530 U.S. 428, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000).

{¶ 22} In general, the State has the burden to show by a preponderance of the evidence that a defendant's confession was voluntarily given. *State v. Melchior*, 56 Ohio St.2d 15, 381 N.E.2d 195 (1978). "The test for voluntariness under a Fifth Amendment analysis is whether or not the accused's statement was the product of police overreaching." *State v. Green*, 2d Dist. Greene No. 2007-CA-2, 2009-Ohio-5529, ¶ 79, citing *State v. Dailey*, 53 Ohio St.3d 88, 92, 559 N.E.2d 459 (1990), citing *Moran v.*

*Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986). "In deciding whether a defendant's confession is involuntarily induced, the court should consider the totality of the circumstances, including the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement." *State v. Edwards*, 49 Ohio St.2d 31, 358 N.E.2d 1051 (1976), paragraph two of the syllabus, *overruled on other grounds*, 438 U.S. 911, 98 S.Ct. 3147, 57 L.Ed.2d 1155 (1978).

{¶ 23} A defendant's statement to police is voluntary absent evidence that his will was overborne and his capacity for self-determination was critically impaired due to coercive police conduct. *Colorado v. Spring*, 479 U.S. 564, 574, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987); *State v. Otte*, 74 Ohio St.3d 555, 562, 660 N.E.2d 711 (1996).

*c. August 1, 2017 statements to West Carrollton Police*

{¶ 24} In its decision denying Sellars's motion to suppress, the trial court made the following findings of fact regarding the circumstances of Sellars's statements to police on August 1, 2017:

> After the dispatch center confirmed that Sellars had outstanding warrants in Dayton, the officers arrested him and placed him in the back of Off. Harper's cruiser. Off. Harper and Detective Allison questioned Sellars for about forty-five minutes before giving him to the medics for Sellars' foot injury. The foot injury was from Sellars' wrecking of a motorcycle, which occurred before Sellars had arrived at the barn.
>
> Off. Harper's cruiser camera recording confirmed the officers' testimony that Off. Harper read Sellars his *Miranda* rights and that Sellars

verbally acknowledged that he understood all of the rights. Sellars did not seem confused and did not appear to be under the influence. Although Sellars was emotional at times, he responded to all questions appropriately and appeared alert. Sellars did not invoke his right to remain silent or for [sic] an attorney. The cruiser camera further showed that after reading Sellars his *Miranda* rights, Off. Harper stated "the only thing that is going to get you out of jail is being 100% honest" and "give me more information, and I will help you out as much as I can . . . I can make that stuff (charges) work out in your favor as long as you give me something good."

After Off. Harper completed his questioning, Det. Allison spoke with Sellars. The medics then transported Sellars to the hospital.

Sellars testified that he was very hot that day. Sellars further stated that before Off. Harper told him that he was going to jail, he asked for medical assistance for the foot injury. The Court notes that when Det. Allison asked Sellars about his foot injury, Sellars said that he was in pain, but at no time did Sellars state that he needed immediate medical treatment. Sellars asked for some water a few times, but he never asked the officers to stop questioning.

(Parenthetical sic; citations to record omitted.). (1/16/18 Decision, Order and Entry, p. 2-3.)

{¶ 25} Our review of footage recorded by Officer Harper's cruiser camera on August 1 shows that competent, credible evidence supports the trial court's findings of fact set forth above. (*See* Suppression Hearing, State's Exh. 1.) The video depicts a

handcuffed and shirtless Sellars being placed sideways in the backseat of the police cruiser, with his head and upper torso extended outside of the vehicle's open door and his feet on the ground. An officer told Sellars that he would be transported to a hospital after questioning and might be picked up from there by Dayton police due to outstanding warrants. The officer then read *Miranda* warnings to Sellars, who orally confirmed his understanding and agreed to talk. The recording reflects a presumptively valid waiver of Sellars's rights to remain silent and to an attorney. We therefore proceed to examine whether the interrogation conditions were such as to negate the voluntariness of Sellars's incriminating statements that followed.

{¶ 26} At the time of the August 1 interview, Sellars was 30 years old, had a GED, had been convicted of three prior felonies as an adult, and had served time in prison. Sellars provided coherent responses to each of the officers' questions. He claimed to have "traded" methamphetamine for some of the items found in his possession. One officer told Sellars that he was "looking at a lot of charges," but the officer might be able to "work with" Sellars as to the misdemeanor offenses (including drug paraphernalia). The officer also alluded to the possibility of a reward for the return of certain stolen property with "sentimental value." However, the officers' representations about their willingness to help Sellars in exchange for his honesty and cooperation were too vague to constitute false promises of leniency that might invalidate his waiver of rights.

{¶ 27} While a defendant's use of drugs may affect whether his or her *Miranda* waiver was knowingly, intelligently, and voluntarily made, "[i]ntoxication will not render a defendant's waiver of his *Miranda* rights invalid unless his ability to reason is sufficiently impaired." *State v. Verdell,* 2d Dist. Montgomery No. 27786, 2018-Ohio-4766, ¶ 34. Early

in the August 1 interview, Sellars told officers that he had not taken drugs for "two or three days." Although he later mentioned that he took something to ease the pain from a motorcycle accident earlier that day, he specified that it was "not a narcotic or anything." (Suppression Hearing, State's Exh. 1.) Nothing in the recording supports a conclusion that Sellars's ability to make a valid *Miranda* waiver was impaired by drug use.

{¶ 28} More than 30 minutes into the interview, Sellars asked for water. He then exclaimed "ow" a few times while shifting his position. At no time, however, did Sellars state or otherwise convey that his pain from the earlier motorcycle accident was so severe as to require immediate medical intervention. We have found that a defendant's failure to seek medical treatment on his own for injuries incurred hours before he was detained by police "lend[s] credence to a finding that the injuries were not of such severity that necessitated law enforcement immediately transporting him to a hospital before conducting an interrogation." *State v. Raines*, 2d Dist. Montgomery No. 24227, 2011-Ohio-3735, ¶ 47. Given that Sellars later chose to leave the hospital after receiving only pain medication, declining further treatment, and that he also was able to flee from police at a crime scene only three days later, significant evidence supports a conclusion that his foot injury was not significant enough to invalidate his *Miranda* waiver.

{¶ 29} Near the end of the interview, Sellars told officers that he was "really hot" and "really dehydrated." About one minute thereafter, he was removed from the back of the cruiser for transport to the hospital. Although Sellars was not given a drink of water in response to his prior request, a relatively short time (about 16 minutes) passed between that request and the end of the interview, and there is no evidence that the officers had ready access to potable water near the barn where Sellars was found or that not receiving

water affected the voluntariness of his statement. Sellars's incriminatory statements were not the product of law enforcement officers deliberately withholding water in order to induce Sellars's cooperation.

{¶ 30} Based on the trial court's findings of fact, as confirmed by our review of the evidence, there is no suggestion that Sellars's will was overborne by police officers during the August 1, 2017 interview. The trial court did not err by denying Sellars's motion to suppress statements he made during the August 1, 2017 interrogation.

*d. August 4, 2017 statements to Kettering police*

{¶ 31} The trial court issued these factual findings as to Sellars's August 4, 2017 statements to police:

> On August 4, 2017, Off. Kramer was dispatched to a neighborhood of western Kettering where Sellars was found hiding following a foot pursuit. Off. Kramer did not question Sellars, but Sellars made some statements after he was placed in the back of a cruiser. Off. Kramer testified that these statements were not made in response to any questions or any nonverbal actions. Sellars made these statements spontaneously and voluntarily.

(1/16/18 Decision, Order and Entry, p. 3.)

{¶ 32} The transcript of Officer Kramer's suppression hearing testimony is consistent with the trial court's findings. No evidence was presented to indicate that Officer Kramer asked any questions, made any promises or threats to Sellars, or that Officer Kramer withheld water, medical attention, or any other items or assistance that Sellars requested or appeared to need. The trial court did not err in denying Sellars's motion to suppress with regard to any statements made while he was being transported

in Officer Kramer's cruiser on August 4, 2017, and Sellars's assignment of error is not well taken as to such statements.

*e. August 5, 2017 statements to Centerville and Moraine police*

{¶ 33} The trial court's findings of fact as to statements Sellars made on August 5, 2017 were as follows:

On August 5, 2017, Sergeant James Myers from the City of Centerville Police Department and Detective Burns from the City of Moraine Police Department interviewed Sellars at an interview room at the Moraine Police Department. Deputy Chief Bower [sic][5] from the Moraine Police Department participated in part of the interview as well.

The video camera recording shows that Sgt. Myers read Sellars his *Miranda* rights pursuant to the Pre-Interview Form. At the end of each rights [sic], Sellars indicated verbally that he understood his rights. Sellars then signed the Pre-Interview Form, indicating his waiver. (State Ex. 2).

The video camera recording shows that Sellars made incriminating statements then became evasive. Sgt. Myers then told Sellars that he [Myers] got to make the decision on whether Sellars is going to be prosecuted in Montgomery County or Greene County (as it was the Green [sic] County property that was stolen), that Sellars would face harsher penalty in Greene County, and that if Sellars helped with recovering the stolen property, then it is going to look favorably on Sellars and it is probably

---

[5] Elsewhere the Moraine Deputy Chief's last name is identified as "Neubauer." (*See, e.g.,* Tr. p. 66; 86; Brief of Appellee p. 2).

going to make Sgt. Myers' decision easier.

The video camera recording further shows that Sellars did not appear to be under the influence and that he responded [to] questions coherently and intelligently. Sellars did not invoke his right to remain silent or for [sic] an attorney. The officers did not make any threats, nor was there any physical or verbal abuse. Sellars requested drinking water a number of times, and the officers provided him with water promptly.

Sellars testified that during the interview, one of the officers told him that if he cooperated and admitted the crime, then the officers would put in Sellars' report that Sellars needed drug treatment. Sellars further stated that the officers did not promise or guarantee drug treatment. The video recording shows that at one point, Sellars stated, "I am telling you the truth[,] I am being honest because I am hoping that . . . I am really hoping that you can help me in some type of way, but I know that you are not." To which Deputy Chief Bower responded, " . . . you got drugs running your life, the best thing you can do to own up . . . to say hey I made a mistake, I am man enough, I am being 100% honest . . . and I want to get treatment . . . the best thing you can do is to lead us to the stolen [property]."

(Citations to record omitted.) (1/16/18 Decision, Order and Entry, p. 3-4.)

{¶ 34} The trial court's findings of fact accurately summarize the August 5, 2017 interrogation, which lasted between 60 and 90 minutes. Immediately after entering the interview room, Sellars asked for a drink of water. (Suppression Hearing, State's Exh. 6.) One officer relayed that request to someone outside the room, and the officers waited

briefly for someone to return with a cup of water. They then allowed Sellars to drink the water before questioning proceeded.

{¶ 35} Sgt. Myers began by suggesting that Sellars might be able to help himself by cooperating. Sgt. Myers then read the *Miranda* pre-interview form to Sellars, asked him to orally confirm his understanding of each right, and had him sign the *Miranda* waiver. (*See* Suppression Hearing, State's Exh. 2.) Sellars, who was coherent and alert throughout, quickly admitted to possessing certain stolen items, but initially attempted to deny involvement in the theft of other items, including police badges, a bulletproof vest, and guns. When Sgt. Myers suggested that he could try to get Sellars help for being "dope sick," Sellars responded that he was "not going back to MonDay." Sellars then stated, "You guys got me. I'm not going to deny it."

{¶ 36} Sgt. Myers told Sellars that his cooperation would go farther if the police were able to recover stolen "police items." Sgt. Myers then stated that he would decide whether Sellars was charged in Montgomery County or Greene County, where the punishment would be "harsher." Sellars gradually admitted to additional acts, and told the officers he knew and could show them where everything he had taken was located. Shortly thereafter, Sellars asked for more water. One officer immediately took Sellars's empty cup to the door; the refilled cup was returned to Sellars within two minutes.

{¶ 37} After some additional questioning, Deputy Chief Neubauer entered the room. He said that he knew Sellars had "a dope problem" and had traded a stolen bulletproof vest for drugs. Sellars responded with additional admissions. He once interjected that he "shouldn't talk," but he never invoked his right to remain silent or requested an attorney. Instead, he expressed hope that the officers would help him, but

doubted that they would.

{¶ 38} Eventually, Sellars admitted to selling or trading to his drug dealer the bulletproof vest and most of the ammunition he stole. He also admitted to selling a stolen Winchester rifle and to trading a stolen Colt pistol for an AK-47, which later was stolen from him. A few minutes later, Sellars again asked for water. After a 10-minute discussion of additional charges that could result if Sellars revealed the location of other items and the officers' assurance that additional help would show that Sellars was "remorseful" and "rehabilitate-able," Sellars repeated the request for water. An officer then left the room and soon returned with two cups of water and ice. After drinking most of the water, Sellars was handcuffed. One officer held the cup while Sellars finished the remaining water and ice. The video of the interview then ended.

{¶ 39} Based on the trial court's finding of facts, as corroborated by our review of the recorded police interview of August 5, 2017, the trial court did not err in denying Sellars's motion to suppress the incriminating statements he made during that interview. Sellars did not appear to be under the influence of drugs or suffering from any significant physical impairment or pain. He also was fully advised of his rights under *Miranda* and voluntarily relinquished those rights. Each of Sellars's requests for a drink of water was fulfilled after only a brief delay. The officers made no threats, and their suggestions that they were willing to get Sellars help for his drug problem if he were to cooperate did not amount to specific promises; further, Sellars indicated that he did not want to participate in the MonDay community-based correctional facility for drug treatment.

{¶ 40} Finally, the evidence supports a conclusion that Sgt. Myers did not overreach by telling Sellars that he (Myers) could decide in which county Sellars would

be prosecuted and that his punishment in Montgomery County would be less harsh.[6] Sgt. Myers's representations fell short of guaranteeing Sellars a particular sentence or outcome, and cannot be construed as "false promises of leniency" such as occurred in *State v. Arrington*, 14 Ohio App.3d 111, 470 N.E.2d 211 (6th Dist.1994) (where officers told defendant certain conduct, if admitted, would be "probational"). *See State v. Marks*, 2d Dist. Montgomery No. 19629, 2003-Ohio-4205, ¶ 38-49. Sellars's assignment of error based on the trial court's refusal to suppress statements from his August 5, 2017 interview is overruled.

*f.   August 7, 2017 statements to German Township police*

{¶ 41} The trial court's findings of fact as to Sellars's statements to German Township police on August 7, 2017 were as follows:

On August 7, 2017 at 9:06 a.m., Sgt. Birch interviewed Sellars at the Montgomery County Jail. Sgt. Birch testified that he went over Sellars' *Miranda* rights and Wavier of Rights from the Pre-Interview Form and that Sellars indicated that he understood his rights. The Pre-Interview Form shows Sellars' initials next to each right and his signature below the Waiver of Rights section. (State Ex. 4)[.] Sgt. Birch further testified that Sellars did not appear to be under the influence of any illegal substance. No threats or promises were made.

Sgt. Birch further testified that the interview was stopped midway because Sellars had to go to Court. Sgt. Birch resumed the interview in the

---

[6] Further, there is nothing in the record to suggest that Sellars was also charged in another jurisdiction.

afternoon. Sgt. Birch testified that he went over the Pre-Interview Form with Sellars again, and had Sellars sign below the signature line on the Pre-Interview Form. Sgt. Birch did not make any threats or promises. Sellars was cooperative, and did not appear to be under the influence.

(1/16/18 Decision, Order and Entry, p. 5.)

{¶ 42} We find no error in the trial court's factual findings. An audio recording of the first portion of Sgt. Birch's interview confirms that Sgt. Birch advised Sellars of his *Miranda* rights and Sellars orally affirmed his understanding of those rights. (Suppression Hearing, State's Exh. 3.) The evidence also shows that Sellars initialed and signed a waiver of rights. (*Id.*, State's Exh. 4.) A recording of the initial interrogation reflects that Sellars immediately offered incriminating information without any promises or threats being made by Sgt. Birch; Sellars stated that he was "burned" on methamphetamine use and was cooperating in the hope of getting help. (*Id.*, State's Exh. 3.) Additionally, the recording includes an unidentified female informing Sgt. Birch that the interview would be interrupted soon in order for Sellars to appear in court, and later returning to take Sellars away. (*Id.*, State's Exh. 3.) Only as that interview is ending does Sellars ask for a drink; Sgt. Birch immediately repeats that request to the female officer present, who says that she will see that Sellars gets a drink. (*Id.*)

{¶ 43} No recording of the later-resumed interview appears in the record before us. However, consistent with Sgt. Birch's testimony during the suppression hearing, the waiver of rights form admitted into evidence was signed by Sellars twice, both on and below the signature line. (*Id.*, Exh. 4.) The evidence thus supports Sgt. Birch's testimony that he re-*Mirandized* Sellars prior to resuming the interrupted interview. No contrary

evidence was presented, and we must defer to the trial court's assessment of Sgt. Birch's credibility. Lacking any basis to conclude that Sellars's incriminating statements to Sgt. Birch were the product of promises, threats, drug impairment, or the withholding of water or medical aid, we overrule Sellars's assignment of error as to the trial court's refusal to suppress those August 7, 2017 statements.

*g.  August 7, 2017 statements to Moraine police*

{¶ 44} The trial court made these factual findings as to Sellars's additional interview on August 7:

Sgt. Spencer interviewed Sellars on August 7, 2017 as well. Sgt. Spencer testified that he read Sellars his *Miranda* rights according to the Constitutional Rights Warnings card, and that Sellars indicated that he understood his rights. Sgt. Spencer did not make any promise or threat. Sellars did not invoke his right to silent [sic] or his right for [sic] an attorney.

(1/16/18 Decision, Order and Entry, p. 5.)

{¶ 45} According to Det. Sgt. Spencer, his August 7 interview of Sellars at the Montgomery County Jail was not recorded. (Tr. p. 86.) The record contains nothing to contradict the trial court's foregoing findings, which capture the essence of Det. Sgt. Spencer's suppression hearing testimony. Further, a copy of a *Miranda* warnings card identified by Det. Sgt. Spencer and admitted into evidence supports a conclusion that Sellars was properly informed of his *Miranda* rights and knowingly, intelligently, and voluntarily waived them. (Suppression Hearing, State's Exh. 7.) Det. Sgt. Spencer further testified that Sellars did not appear to be under the influence of any substance. (Tr. p. 88.) Sellars's first assignment of error is overruled as to any statements he made during

his August 7, 2017 interview with Moraine police.

> h.  *August 16, 2017 interview with West Carrollton police*

**{¶ 46}** The trial court's findings of fact as to Sellars's August 16, 2017 interview were as follows:

> On August 16, 2017, Det. Allison interviewed Sellars at the Montgomery County Jail. Detective Allison testified that he read Sellars his *Miranda* rights according to the Constitutional Rights Warnings card. Det. Allison further testified that Sellars understood his rights and that Sellars did not appear to be confused. Sellars waived his rights and spoke with Det. Allison. Sellars did not invoke his right to remain silent or for [sic] an attorney. This interview was not recorded.

(1/16/18 Decision, Order and Entry, p. 5)

**{¶ 47}** Once again, the record is devoid of evidence to contradict the trial court's findings, and the *Miranda* warnings card identified by the witness establishes that Sellars was properly advised of the rights he thereafter waived. (*See* Suppression Hearing, State's Exh. 7.) The trial court did not err by denying Sellars's motion to suppress any statement he made on August 16, 2017, and Sellars's assignment of error on that basis is overruled.

> i.  *August 21, 2017 interview with Moraine police*

**{¶ 48}** The trial court made the following findings of fact as to Sellars's final police interview:

> On August 21, 2017[,] Det. Burns and Sgt. Spencer interviewed Sellars at the Montgomery County Jail. Prior to questioning Sellars,

Detective Burns read Sellars his Miranda [sic] rights following the Pre-Interview Form. Sellars' initials appear next to his Rights, and his signature appears at the Waiver of Rights Section. (State Ex. 5.) Det. Burns and Sgt. Spencer testified that Sellars did not appear to be under the influence, and that no promises or threats were made. This interview lasted about no more than an hour, and the conversation was described as "cordial" and "casual."

(1/16/18 Decision, Order and Entry, p. 6.)

{¶ 49} The undisputed evidence establishes that Sellars made a knowing, intelligent, and voluntary waiver of his *Miranda* rights with regard to the unrecorded August 21, 2017 interrogation. The trial court did not err by denying Sellars's motion to suppress any incriminating statements that he made to police on that date.

{¶ 50} Sellars's first assignment of error is overruled in its entirety.

**Assignment of Error #2 – Ineffective Assistance of Counsel**

{¶ 51} In his second assignment of error, Sellars contends that his trial attorney provided ineffective assistance during plea negotiations, in that counsel "failed to properly investigate [Sellars]'s personal background and psychological status during the period of the events alleged." (Brief of Appellant, p. 8.) As a result, Sellars allegedly "was coerced, pressured, into accepting a haphazardly entered plea with no time to consider the details of the plea or to fully present his case." (*Id.*) More specifically, Sellars asserts that he was "rushed into a plea agreement that failed to consider * * * that [Sellars] had committed petty offenses in order to support his drug addiction." (*Id.*) He implies that a different outcome may have resulted had his attorney presented "all of the potential evidence of mitigation" to the State and the trial court. (*Id.* at p. 9.)

*a.  Standard of Review*

{¶ 52} In general, we review alleged instances of ineffective assistance of trial counsel under the two-prong analysis set forth in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and adopted by the Supreme Court of Ohio in *State v. Bradley,* 42 Ohio St.3d 136, 538 N.E.2d 373 (1989). Pursuant to those cases, trial counsel is entitled to a strong presumption that his or her conduct falls within the wide range of reasonable assistance. *Strickland.* at 688. To reverse a conviction based on ineffective assistance of counsel, it must be demonstrated that trial counsel's conduct fell below an objective standard of reasonableness and that his or her errors were serious enough to create a reasonable probability that, but for the errors, the result of the trial court proceeding would have been different. *Id.*

{¶ 53} "If a prisoner pleads guilty on the advice of counsel, he must demonstrate that the advice was not 'within the range of competence demanded of attorneys in criminal cases.' " *McMann v. Richardson,* 397 U.S. 759, 771, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970). The same analysis applies to claims of ineffective assistance of counsel with regard to a no-contest plea. *See, e.g., State v. Fitzgerald*, 2d Dist. Greene No. 2001-CA-124, 2002-Ohio-3914, ¶ 43 ("In general, only ineffective assistance of counsel relating to the plea proceeding, itself, will survive a plea of guilty or no contest.").

*b.  Analysis*

{¶ 54} As an initial matter, we note that "[a] claim of ineffective assistance of counsel cannot be asserted on direct appeal if it relies on matters outside the record." *State v. Harris*, 2d Dist. Montgomery No. 27179, 2017-Ohio-9052, ¶ 19, citing *State v. Thomas*, 2d Dist. Montgomery No. 26907, 2017-Ohio-5501, ¶ 28. Here, nothing in the

record substantiates Sellars's suggestion that his trial attorney was unaware of Sellars's history of drug addiction when negotiating the plea agreement. To the contrary, the transcript of the suppression hearing is replete with evidence, including Sellars's own testimony, about Sellars's methamphetamine use and his practice of selling or trading stolen goods in order to acquire drugs. (Tr. p. 102-136.) Additionally, the recordings of Sellars's various police interviews contain multiple discussions of Sellars's drug problems, as well as acknowledgments by both police officers and Sellars himself that he needed help for his addiction.

{¶ 55} The attorney who represented Sellars at the November 2, 2017 suppression hearing was not his counsel at the time of the plea hearing. A different attorney was appointed for Sellars on January 24, 2018, and continued to represent him through sentencing. The transcript indicates that, with Sellars's consent, a third attorney appeared during the plea hearing as a temporary substitute for Sellars's appointed counsel, who was "in another county in trial" on that date. (Tr. p. 142.) Nevertheless, according to the record, the plea agreement was negotiated through Sellars's second appointed counsel (*see id.* at p. 143), and Sellars had discussed the agreement with him. (*Id.* at p. 156, 161.) Sellars's brief does not raise the temporary substitution as a factor in his ineffective assistance of counsel claim.

{¶ 56} Although the attorney who negotiated Sellars's plea agreement was not present during the suppression hearing testimony, we may not presume that such attorney failed to discuss with Sellars the circumstances of the offenses or to review the evidence gathered prior to the plea hearing. We also cannot presume that such counsel failed to take the evidence of Sellars's addiction into consideration if and when advising

Sellars to accept a plea agreement. The lack of evidence that the performance of Sellars's attorney as to the no-contest plea fell outside the expected "range of competence" requires overruling this assignment of error. *See Tollett v. Henderson,* 411 U.S. 258, 266, 93 S.Ct. 1602, 36 L.Ed.2d 235 (1973).

{¶ 57} Further, most of what Sellars characterizes as the "petty offenses" (*see* Brief of Appellant, p. 8) when referring to his convictions were felonies involving burglaries of residential homes, many carrying mandatory prison sentences. Nothing in the record supports a conclusion that the State would have entered into a plea agreement more favorable to Sellars if Sellars's attorney had delved deeper into the details of Sellars's addiction, or that Sellars would have received a more favorable outcome had he proceeded to trial.

{¶ 58} In addition, as Sellars was made aware at the time of his plea, the trial court was not bound by the terms of Sellars's plea agreement with the State. The PSI reviewed by the trial court conveyed Sellars's own statements about a "nine month drug binge * * * using methamphetamine almost on a daily basis" and attributing his recent crimes to his drug use. Despite that information, the trial court imposed prison terms totaling 20 years, less than the 30 year "cap" for which the "plea agreement" allowed. Given that exercise of the trial court's discretion, the record leaves no basis for us to conclude that Sellars would have received a lesser sentence had his attorney investigated more thoroughly Sellars's history of drug addiction.

{¶ 59} Sellars's second assignment of error is overruled.

## Assignment of Error #3 – Improper Sentence

{¶ 60} Sellars's final assignment of error argues that the trial court erred by

sentencing him to more than the statutory minimum for his crimes. He contends that incarceration was "unnecessary"[7] and that "a term of mandatory drug rehabilitation would have been more than adequate" punishment for his "petty criminal activity." (Brief of Appellant, p. 10.) He also suggests that he was denied due process because his sentence was imposed in the absence of evidence about his "mental health." (*Id.)*

### a. Reviewability of sentence

{¶ 61} As a preliminary matter, we must examine the State's contention that Sellars's sentences are not reviewable on appeal because the total sentence imposed fell within the range specified in the parties' plea agreement. Pursuant to R.C. 2953.08(D)(1), "[a] sentence imposed upon a defendant is not subject to review under this section if the sentence is authorized by law, has been recommended jointly by the defendant and the prosecution in the case, and is imposed by a sentencing judge."

{¶ 62} As interpreted by another Ohio appellate court, R.C. 2953.08(D)(1) does not preclude appellate review where a defendant and the State "agreed only to a maximum cap or 'ceiling' on [the defendant's] sentence, and not a specific agreed sentence or a definite agreed sentencing range." *State v. Perry*, 2018-Ohio-1760, 111 N.E.3d 746, ¶ 12 (8th Dist.). In that case, the defendant's attorney specified at the plea hearing that there was no agreement as to a sentence, only as to a sentencing cap. *Id.* at ¶ 10-11. The Eighth District Court of Appeals reasoned that an agreement only as to a sentencing cap "is not an 'agreed sentence' under R.C. 2953.08(D)(1)," making the resulting sentence reviewable. *Id.* Subsequently, the Sixth District applied that same reasoning in determining that R.C. 2953.08(D)(1) does not bar appellate review of a

---

[7] In fact, some of the offenses to which Sellars pled carry mandatory prison terms.

purportedly excessive fine where the parties agreed only as to the maximum amount of the fine to be imposed. *See State v. Jones*, 6th Dist. Sandusky No. S-18-036, 2019-Ohio-2646, ¶ 1, citing *Perry* at ¶ 12.

{¶ 63} The circumstances before us are remarkably similar to those in *Perry*. The transcript of Sellars's plea hearing records the following exchange:

[PROSECUTOR]: It's my understanding that Defendant – after negotiating and discussing the case with Defendant's counsel * * *, it's agreed that the Defendant will tender no contest pleas to every one of the counts in both of the two indictments. *There is no agreement as to his sentence*. However, his sentence will run somewhere between the two years on the firearm specification consecutive plus nine months.

So that would be two years and nine months on the firearm specification and the minimum sentence on the grand theft of a firearm, and his sentence will not exceed 30 years, between that number, each side is going to argue their respective positions for that sentence.

THE COURT: So let me make sure I understand this and state clearly for the record that there is no agreement * * * to reduction or nulling any of the charges; however, there is an agreement as to a cap essentially of 30 years? Is that correct?

[PROSECUTOR]: That's correct.

THE COURT: There is a mandatory minimum sentence of --

[PROSECUTOR]: Yes.

THE COURT: -- is it 2.9 or two years?

[PROSECUTOR]: Two years nine months.

THE COURT: Two years, nine. Thank you. Two years and nine months.

[PROSECUTOR]: Yes.

THE COURT: With a cap of 30 years, right?

[PROSECUTOR]: Yes.

THE COURT: [Defense counsel], that's your understanding as well?

[DEFENSE COUNSEL]: That is our understanding.

THE COURT: And to Mr. Sellars, that's your understanding too?

[SELLARS]: Yes, sir, Your Honor.

(Emphasis added.) (Tr. p. 143-144.)

{¶ 64} This Court previously has held that "a sentence within an agreed-upon range is a jointly-recommended sentence under R.C. 2953.08(D)(1)." *State v. Connors,* 2d Dist. Montgomery No. 26721, 2016-Ohio-3195, ¶ 4, citing *State v. Collini*, 2d Dist. Montgomery No. 26587, 2015-Ohio-4784, ¶ 12. In *Connors*, however, the parties had agreed to a prison sentence of between 19 and 25 years. *Id.* at ¶ 2. Similarly, the plea agreement of the parties in *Collini* provided for a sentence ranging from 12 to 20 years. *Collini* at ¶ 13. For that reason, in *Connors*, this Court expressly declined to decide "[w]hether a sentencing range that is not discretely defined, or is as broad as the statutorily defined range, would constitute an agreed-upon sentence for purposes of appealability." *Id.* at ¶ 4, fn.2.

{¶ 65} *Connors and Collini* are distinguishable from the present case in that both involved agreements to a discrete sentencing range of eight or fewer years, as opposed

to simply recognizing the statutory minimum sentence and agreeing to a "cap" that exceeded that minimum by more than 27 years. The issue that was not before us in *Connors* is squarely presented here. These circumstances are more similar to those in *Perry*, 2018-Ohio-1760, 111 N.E.3d 746, and we find that decision persuasive.

{¶ 66} The reasoning employed by the Eighth District in *Perry* seems even more compelling where, as here, it was the *prosecutor* rather than defense counsel who specified on the record that there was "no agreement" as to the defendant's sentence, only as to a sentencing cap. (*Id.* at p. 143.) In our view, the parties' agreement to a 30-year cap and mere acknowledgment of the mandatory minimum sentence for the offenses to which Sellars would be pleading, especially where the court explicitly said it was not bound by any agreement, did not amount to a "jointly recommended sentence" within the meaning of R.C. 2953.08(D)(1). For that reason, we find that the 20-year sentences imposed by the trial court are subject to appellate review.

*b. Due process claim – absence of mental health evidence*

{¶ 67} We cannot consider on direct appeal a claim based upon the failure to present mental health evidence where no such evidence appears in the record. *See State v. Schiessler*, 2d Dist. Montgomery No. 24771, 2012-Ohio-4085, ¶ 25.[8] The only arguable evidence of any mental health problem from which Sellars suffered consists of the repeated references to his addiction issues, which were presented to the trial court. Sellars's assignment of error based on mental health matters outside the record is

---

[8] As we noted in *Schiessler*, if Sellars did suffer from mental health issues of which the trial court was not made aware, evidence of such issues "could be the basis for a petition for post-conviction relief, where evidence outside the record of the direct appeal is permitted." *Id.*

overruled.

    *c. Standard of Review*

{¶ 68} In reviewing felony sentences, appellate courts must apply the standard of review set forth in R.C. 2953.08(G)(2), rather than an abuse of discretion standard. *See State v. Marcum*, 146 Ohio St.3d 516, 2016-Ohio-1002, 59 N.E.3d 1231, ¶ 9. Under R.C. 2953.08(G)(2), an appellate court may increase, reduce, or modify a sentence, or it may vacate the sentence and remand for resentencing, only if it "clearly and convincingly" finds either (1) that the record does not support certain specified findings or (2) that the sentence imposed is contrary to law. *State v. Huffman*, 2d Dist. Miami No. 2016-CA-16, 2017-Ohio-4097, ¶ 6.

{¶ 69} "The trial court has full discretion to impose any sentence within the authorized statutory range, and the court is not required to make any findings or give its reasons for imposing maximum or more than minimum sentences." *State v. King*, 2013-Ohio-2021, 992 N.E.2d 491, ¶ 45 (2d Dist.). However, in exercising its discretion, a trial court must consider the statutory policies that apply to every felony offense, including those set out in R.C. 2929.11 and R.C. 2929.12. *State v. Leopard*, 194 Ohio App.3d 500, 2011-Ohio-3864, 957 N.E.2d 55, ¶ 11 (2d Dist.), citing *State v. Mathis*, 109 Ohio St.3d 54, 2006-Ohio-855, 846 N.E.2d 1, ¶ 38.

{¶ 70} R.C. 2929.11 requires trial courts to be guided by the overriding purposes of felony sentencing. Those purposes are "to protect the public from future crime by the offender and others, to punish the offender, and to promote the effective rehabilitation of the offender using the minimum sanctions that the court determines accomplish those purposes without imposing an unnecessary burden on state or local government

resources." R.C. 2929.11(A). The court must "consider the need for incapacitating the offender, deterring the offender and others from future crime, rehabilitating the offender, and making restitution to the victim of the offense, the public, or both." *Id.* R.C. 2929.11(B) further provides that "[a] sentence imposed for a felony shall be reasonably calculated to achieve the three overriding purposes of felony sentencing * * *, commensurate with and not demeaning to the seriousness of the offender's conduct and its impact upon the victim, and consistent with sentences imposed for similar crimes committed by similar offenders."

{¶ 71} R.C. 2929.12(B) sets forth nine factors indicating that an offender's conduct is more serious than conduct normally constituting the offense; R.C. 2929.12(C) sets forth four factors indicating that an offender's conduct is less serious than conduct normally constituting the offense. R.C. 2929.12(D) and (E) each lists five factors that trial courts are to consider regarding the offender's likelihood of committing future crimes. Finally, R.C. 2929.12(F) requires the sentencing court to consider the offender's military service record, if any.

{¶ 72} In general, it is presumed that prison terms will be served concurrently. R.C. 2929.41(A); *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659, ¶ 16, 23 ("judicial fact-finding is once again required to overcome the statutory presumption in favor of concurrent sentences"). However, after determining the sentence for a particular crime, a sentencing judge has discretion to order an offender to serve individual counts of a sentence consecutively to each other or to sentences imposed by other courts. R.C. 2929.14(C)(4) permits a trial court to impose consecutive sentences if it finds that (1) consecutive sentencing is necessary to protect the public from future crime or to punish

the offender, (2) consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and (3) any of the following applies:

(a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

*d. Analysis*

{¶ 73} During the sentencing hearing, the court set out some of the rationale for its decision as follows:

Mr. Sellars, the Court's [sic] in your case reviewed the presentence investigation at considerable length. I have received statements on your behalf * * *. I reviewed both of those. I've also reviewed the statements and obviously heard the statements here today of the victims. * * *

Now Mr. Sellars, in reviewing all of those, reviewing your PSI, the

facts of this case as they came through in the different hearing.[9] In a very short number of years, you have shown and now conclusively demonstrated that you are incapable of abiding by the laws of the State of Ohio. You violated the privacy and security of a number of victims throughout this county and it's truly by an act of grace that nobody was hurt, injured, or killed.

Now your statements here today regarding your sorrow and the illness of addiction that plagues you are not lost, but your true remorse as your attorney indicated is something that words alone cannot only be the gauge of. That your actions from this point forward will truly gauge whether or not you are remorseful for these actions.

* * *

Turning to the facts of this case and Revised Code 2929.14(C)(4), the Court does find that in these cases consecutive sentencing is necessary, to not only protect the public from your future crime but in order to adequately punish you. Also, that consecutive sentences are not disproportionate to the seriousness of your conduct and the danger that you pose to the public.

Finally, that * * * [at] least * * * two of the multiple offenses were committed as part of one or more course of conduct and the harm caused by multiple offense was so great or unusual that no single prison term can adequately reflect the seriousness of your conduct and your history of

---

[9] This presumably refers to the lengthy hearing on Sellars's motion to suppress.

criminal conduct does demonstrate that consecutive sentences are necessary to protect the public from future crime * * *

(Tr. p. 177-178, 181-182.)

{¶ 74} The record reflects that the trial court considered the relevant felony sentencing factors in determining Sellars's sentences. The maximum possible aggregate prison term for the 27 offenses to which Sellars pled no contest was 79 years and six months (Tr. p. 163); the mandatory minimum sentence was two years and nine months. (Tr. p. 143.) The individual sentences in each case fell within the authorized statutory ranges, and the aggregate 20-year sentence in both cases, run concurrently with each other, was below the 30-year cap to which the parties had agreed. The sentences for one offense (escape) and the firearm specifications were mandated by statute to be served consecutively, and the trial court made the requisite findings under R.C. 2929.14(C)(4) in order to have certain other sentences be consecutive rather than concurrent.

{¶ 75} After reviewing the record, we are unable to clearly and convincingly conclude that the record does not support the trial court's findings. The PSI revealed that Sellars had an extensive juvenile record from 2000 to 2003, including multiple criminal trespass and theft offenses. As an adult, he was found guilty of 20 misdemeanor offenses between 2005 and 2017, several related to criminal trespass, fleeing, or receiving stolen property. In 2005, Sellars was convicted of attempted robbery (physical harm) and sentenced to community control, from which he absconded on three occasions. He then was sent to MonDay for 180 days, but failed to complete the program. In 2009, he was convicted of aggravated assault (deadly weapon) and served one year in prison. Following a robbery conviction in 2016, Sellars was sentenced to community control, but

again absconded before being arrested and returned to supervision. Sellars's documented history of unsuccessful response to lesser punishments and of frequently reoffending provided support for the trial court's conclusion that consecutive sentences were necessary in order to protect the public from future crimes and to adequately punish Sellars.

{¶ 76} The evidence also supported a conclusion that most of the 27 offenses Sellars committed in these two cases were part of a course of conduct that involved entering private residences and related structures in order to steal property found within. *See* R.C. 2929.14(C)(4)(b). Among the stolen property were multiple guns and a large stock of ammunition that Sellars sold or traded to others, including one man he identified as a drug dealer. The victim impact statements submitted to the trial court included assertions that numerous people (some children) living in the residences Sellars had targeted were experiencing continued anxiety and fear after Sellars invaded their homes. Those facts substantiate the trial court's findings regarding the seriousness of Sellars's crimes, the great or unusual harm he caused, and the danger he posed. Consequently, we cannot say that the trial court's findings lack support in the record.

{¶ 77} Sellars's third assignment of error is overruled.

### Conclusion

{¶ 78} For the foregoing reasons, the judgments of the trial court will be affirmed.

. . . . . . . . . . . . .

DONOVAN, J. and HALL, J., concur.

Copies sent to:

Mathias H. Heck Jr.
Heather N. Ketter
Alex F. Kochanowski
Hon. Gerald Parker